69  80
133  459
69  80
141  184
69  80
149  607
69  80
52a  584
69  80
163  191
69  80
178  309
178  577
69  80
210  ³298
69  80
114a  381

IRA Y. MUNN et al.

v.

THE PEOPLE OF THE STATE OF ILLINOIS.

1. CONSTITUTIONAL LAW—regulating business pursuits, not prohibited by 14th amendment to constitution of the U. S. The 14th amendment to the constitution of the United States was adopted to shield a certain class of persons known as freedmen, from legislation by which their newly acquired rights might be crippled and rendered unavailing, and was not intended to interfere with State laws for the regulation of pursuits, professions or the use of property.

2. SAME—granting of special privileges, immunities, etc. The prohibition in sec. 22 of article 4 of the new constitution of this State, against "granting to any corporation, association or any individual, any special or exclusive privilege, immunity or franchise whatever," extends only to the passing of special or local laws for such purpose. The act of April 25, 1871, to regulate public warehouses and the warehousing and inspection of grain, is not in contravention of this clause of the constitution.

3. SAME—act of 1871 regulating public warehouses and fixing the maximum of charges, is constitutional. The act of April 25, 1871, entitled "An act to regulate public warehouses, and the warehousing and inspection of grain, and to give effect to article 13 of the constitution of the State," and which provides a maximum rate of charges, is not in violation of that clause of the Bill of Rights which declares that, "no person shall be deprived of life, liberty or property, without due process of law," nor of that clause which provides that "private property shall not be taken or damaged for public use, without just compensation."

4. SAME—depriving one of property. The constitutional provision prohibiting the deprivation of property is not infringed by a proper law regulating a business which may render property used to carry on the business less valuable. If the business is still allowed to be carried on, and the property used is allowed to exist, and its possession is not disturbed, the owner can not be said to be deprived of his property.

5. SAME—extent of legislative power. Every subject within the domain of legislation, and within the scope of civil government, not withdrawn from it by the constitution of the State or of the United States, can be dealt with by the General Assembly by general laws to affect the whole State and all the people within it, and, independent of the express authority conferred by the constitution, the regulation of warehouses and elevators as instrumentalities affecting trade and commerce, would be a legitimate and proper exercise of the legislative power.

6. All regulations of trade with a view to the public interests, may more or less impair the value of property, but they do not come within the constitutional inhibition, unless they virtually take away and destroy those rights in which property consists, and the destruction must be, for all substantial purposes, total.

7. SAME—*anticipated profits not property in the sense of the constitution.* Anticipated profits are not and can not be held and regarded as property in the ownership or possession of him who owns the article out of which profits are expected to flow. They are not *in esse*, and can not be regarded as property within the meaning of the word in the constitutional provision against being deprived of the same.

8. The clause in our Bill of Rights, that no person shall be deprived of property, etc., without due process of law, has never been construed by the courts of any State whose constitution has such a provision, as to deny the legislature power to make all needful rules and regulations respecting the use and enjoyment of property. Familiar instances of the unquestioned exercise of this power are found in laws regulating public ferries and mills, and fixing compensation in the shape of tolls, fixing the value of the use of money, and giving municipal bodies power to regulate the charges of hackmen and draymen, and the weight and price of bread.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM W. FARWELL, Judge, presiding.

This was a proceeding by information, filed by the State's Attorney, on behalf of the people, against Ira Y. Munn and George L. Scott, for a violation of the 2d, 3d, 4th and 5th sections of what is commonly called "the Warehouse Law," approved April 25, 1871.

The information, after the caption, is as follows:

"Now, on this day, comes into open court, in his own proper person, Charles H. Reed, State's Attorney in and for said county, in the name and by the authority of the people of the said State of Illinois, and prosecutes in this behalf, for and on behalf of said people, and informs said court that Ira Y. Munn and George L. Scott, on the 28th day of June, A. D. 1872, at and within the city of Chicago, in said county of Cook, in the State of Illinois aforesaid, were the managers of a certain public warehouse located in said city of Chicago, known

as 'The Northwestern Elevator,' and that the said Ira Y. Munn and George L. Scott did then and there store grain in bulk in said warehouse, and did then and there mix the grain of different owners together in said warehouse, and that the said city of Chicago did then and there contain more than 100,000 inhabitants, and that they, the said Ira Y. Munn and George L, Scott, did then and there unlawfully transact the business of public warehousemen in said warehouse, in the manner and form aforesaid; and that they, the said Ira Y. Munn and George L. Scott, did not procure a license from the circuit court of said county, permitting them to transact business as public warehousemen in said warehouse, in manner and form as aforesaid, under the laws of said State of Illinois, before transacting the business aforesaid of public warehousemen as aforesaid. contrary to the statute and against the peace and dignity of the same people of the State of Illinois."

The second count is precisely like the first, except that the defendants are charged as *lessees* of the public warehouse, and that they transacted business therein as warehousemen, without having taken out a license therefor, as charged in the first count.

The defendants entered a motion to quash the information, which the court overruled. The defendants then entered the plea of not guilty, a jury was waived, and the cause tried by the court upon an agreed statement of facts. The court found the defendants guilty, and, overruling motions for a new trial and in arrest of judgment, rendered judgment on the finding for $100 fine and costs of the proceeding.

Mr. JOHN N. JEWETT, Mr. W. C. GOUDY, and Messrs. McCAGG, FULLER & CULVER, for the plaintiffs in error.

Mr. JAMES K. EDSALL, Attorney General, Mr. C. H. REED, State's Attorney, Mr. R. M. BENJAMIN, and Messrs. HITCHCOCK, DUPEE & EVARTS, for the People.

Mr. Chief Justice Breese delivered the opinion of the Court:

This was a proceeding by information in the Criminal Court of Cook county, on behalf of the people, against Ira Y. Munn and George L. Scott, for a violation of the 3d and 4th sections of an act of the General Assembly of this State, entitled "An act to regulate public warehouses, and the warehousing and inspection of grain, and to give effect to article 13 of the constitution of the State," approved April 25, 1871.

The information was filed by the State's Attorney at the July term, 1872. A motion to quash having been overruled, the defendants pleaded not guilty, waived a trial by jury, and submitted the case to the court.

The court found the defendants guilty, and, overruling a motion for a new trial and in arrest of judgment, adjudged against them a fine of one hundred dollars and the costs.

To reverse this judgment the defendants bring the record here by writ of error, assigning various errors, one of which raises the question of the constitutionality of the act under which the proceedings were had, and is the only important question in the case.

This is the second argument of the cause. On the first argument, at the last term, the court, after much deliberation, were unable to reach a satisfactory conclusion. In the meantime, the court had undergone a change by the election of two new members, and it was deemed expedient and proper that they should take part in the decision, and, to enable them to participate, a reargument was directed, and the questions have again been fully, elaborately and ably discussed.

A case of so much importance demanded and has received our most careful consideration, and we are prepared to state the conclusions which a majority of the court has reached.

We do not deem it necessary to take up *seriatim,* and discuss the various propositions presented by counsel, or go over the field of argument they have so fully explored, but, in

what we shall say, it will be found they have all been considered.

Plaintiffs in error insist the statute in question is repugnant to this provision of our constitution found in the "Bill of Rights" as clause 2 of article 2: "No person shall be deprived of life, liberty or property without due process of law," and to this other provision in clause 13 of the same article: "Private property shall not be taken or damaged for public use without just compensation."

One of the counsel for plaintiffs in error makes these points in addition: That the act is repugnant to the 14th amendment of the constitution of the United States; and further, if its provisions can be construed as an inhibition of the warehousing business, except under special conditions, and as conferring the privilege of doing that kind of business upon persons able or willing to comply, and actually complying with these conditions, then, in so far as it is not based upon article 13 of the State constitution, it is repugnant to section 22 of article 4, which prohibits the General Assembly from passing any local or special law "granting to any corporation, association or individual any special or exclusive privilege or immunity whatever."

We will consider these propositions first, as they appear to be thrown into the controversy as mere make-weights, the real merits resting in the two first.

As to the repugnancy of the Warehouse act to the first clause of the 14th amendment of the constitution of the United States, a slight consideration of that amendment, and judicial decisions upon it, will be sufficient to satisfy any one it has no application to this case. That amendment is as follows: "All persons born or naturalized in the United States, or subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any

State deprive any person of life, liberty or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the law."

It is well known the amendment in question was incorporated into the federal constitution to shield a certain class, who had been born and reared in slavery, from pernicious legislation, by which their newly acquired rights by their emancipation might be so crippled as to render them wholly worthless.

In the discussions upon the effect of this amendment, in the slaughter house cases from New Orleans, and the case of Myra Bradwell, plaintiff in error, taken up from this court, it was not intimated by the Supreme Court of the United States that a regulation by a State legislature of a pursuit or profession, or a regulation of the use of property, abridged in any manner the liberty of the citizen, white or black.

Upon the other proposition, we can not perceive that the statute can receive the construction contended for. The section relied on is in these words: "The General Assembly shall not pass local or special laws in any of the following enumerated cases, that is to say—" then follows a large number of specified subjects, the last of which is this: "Granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever."

The inhibition extends only to passing special laws for such purpose. But the law in question is general in its objects, operative throughout the State, and confers no immunity or special or exclusive privilege or franchise upon any individual, association or corporation. It deals with an existing business closely associated with the great agricultural interests of the State, and seeks to regulate it by law. This is the whole scope of the act.

But the important question remains, as presented in the first two points made by plaintiffs in error, and argued with great ability.

Does the act in question deprive the owners or managers of this warehouse of their property, in the sense of the constitution? If it does, it is void, and must be so declared.

This view of plaintiffs in error seems to be based, in a great degree, on the fact that they had constructed their warehouse and established their business long anterior to the enactment of this law. It was established while there was free trade in the business, and their charges were subject to regulation only by competition and agreement, and they now claim a right to continue such use without legislative restraint.

They further say they have complied with all the provisions of the act except the one requiring them to take out a license and enter into bond. The argument is, by this legislative interference, they are deprived of the use of their property, and so depriving them of its free and untrammelled use, they are deprived of their property in the sense of this clause of the Bill of Rights.

Much ingenious argument has been employed to establish this proposition, and the case of *Wynehamer* v. *The People*, 3 Kernan, (N. Y.) 378, cited as 13 N. York, invoked in support and greatly relied on. We have looked into that case, and find that the court was divided in opinion, and the judges who held the act unconstitutional were led to that conclusion because, by the terms of the act itself, the property in intoxicating liquors was substantially destroyed, and thus the owner deprived of his property by mere legislative will. They say, if the act, by its terms, had been applicable only to liquors imported or manufactured after it took effect, it would not have been in conflict with the constitutional provision declaring that "no person shall be deprived of life, liberty or property without due process of law."

The question before the court was, did the prohibitions and penalties of the act pass the boundaries of mere regulation and police, and by their own force work the essential loss or destruction of the property at which it was aimed? The law in question subjected the liquors to seizure and physical

destruction, and as they were, in every sense of the term, property, and so recognized by law, the owner was, by mere legislation, deprived of his property.

It was held that, by the operation of this law, the commercial value of the liquors was annihilated ; that it could not be sold; that it was unlawful to keep it; that all legal protection was withdrawn from it, and that it had become a public nuisance.

These provisions and results, it was held, swept the liquors from the commerce of the State, and thus annihilated the quality of sale which made them valuable to the owner. This, it was held, was destructive of the notion of property. It was further said, when a law annihilates the value of property, and strips it of those attributes by which alone it is distinguished as property, the owner is deprived of it according to the plainest interpretation, and certainly within the spirit of a constitutional provision intended expressly to shield private rights from the exercise of arbitrary power.

This case is much relied on by one of the counsel for plaintiffs in error, and a labored effort made to bring this within its scope.    But the distinction is so obvious that "he who runs may read." Had the act in question sought to deprive warehousemen of any of their antecedent acquisitions, or deprive them of the use of their establishments or confiscate them, as was the case with the New York liquor law, there would be some appositeness and analogy.    Nothing of the kind has been done or attempted, and it is not even complained by the plaintiffs in error that, by compliance with these sections of the law, they would not receive a fair remuneration on their capital invested, and reasonable recompense for all their labors and responsibility.

In the case relied on, the majority admitted the legislature could regulate trade in property of all kinds, but they could not totally annihilate commerce in any species of property, and so condemn the property itself to extinction.    It was on this latter ground the law was held invalid.    What analogy,

we ask, is there in these cases? Does the act of our General Assembly destroy any species of property, or deprive its owner of the use of it? It does not aim at the extinction of these warehouses or any of their attributes. The statute may affect them injuriously in a degree, but it does not say they shall not be allowed to exist at all. The constitutional provision is, no person shall be *deprived* of life, liberty or property, etc. This clause nowhere declares that, in the exercise of the admitted functions of government, private property may not receive remote and consequent injury. No person can claim that, in the exercise of the proper functions of government, his property shall not be diminished in value. The point is, the owner shall not be deprived of his property without due process of law. If, in the exercise of any one of the admitted functions of government, a person's property is rendered less valuable, can it be seriously claimed this provision in the Bill of Rights has been infringed?

Government, in this State, is reposed in three departments composed of separate bodies of magistracy. The whole legislative power is vested by the constitution in the General Assembly, composed of two houses, the members of each to have certain qualifications and to be elected by the people. Every subject within the domain of legislation and within the scope of civil government not withdrawn from it by the constitution of the State, or of the United States, can be dealt with by that body by general laws to affect the whole State and all the people within it. That body is, emphatically, the guardian of the public interests and welfare, and would be derelict in its duty did it fail to exercise all its powers to their promotion and protection. That body is the sole judge of such measures as may advance the interests of the people. Coming, as its members do, directly from the people, and of them, they know the course of trade, the manner in which the great internal commerce of the State is conducted, and by what instrumentalities, and how, by them, the producing and other interests of the State are affected. These, it must

be conceded, are all fit subjects for legislative consideration, and, independent of any constitutional provision, they would have an undoubted right, knowing that a large proportion of our cereals, to reach the markets of the world, were compelled to pass through certain warehouses, called elevators, and subjected to such charges as their owners might see fit to impose, to take up this whole subject as one legitimately within their domain; and if, in their examination of it, they find the owners and managers of these warehouses are an organized body of monopolists, possessing sufficient strength in their combination, and by their connection with the railroads of the State, to impose their own terms upon the producers and shippers of these cereals, to the great detriment of the latter, who are under a kind of moral duress in resorting to them, can it be said to be an usurpation of power on the part of the legislature to bring them in subjection to law, so to regulate their conduct and charges by law, as to prevent oppression and extortion? Can there be a more legitimate subject for the action of a legislative body? We think not. Shall it be said an interest so vast as this is does not deserve governmental care, and is not a proper subject of some kind of governmental control? And if, in the means provided by the legislature to that end, some reduction in their monthly or annual receipts may be the result, can it be said the owners are thereby deprived of their property?

In the case so much relied on, *supra,* it was admitted it was not sufficient the law might impair the value of the property in ever so great a degree, as that destroys no right. It does not deprive the owner of any right of property. All regulations of trade with a view to the public interests, may more or less impair the value of property, but they do not come within the constitutional inhibition unless they virtually take away and destroy those rights in which property consists. This destruction must be, for all substantial purposes, total.

By the law under consideration, no right of property is taken away or destroyed. All the property the owners ever

possessed in this business remains to them untouched by the strong hand of legislative power.

The law must be held to be an honest effort on the part of the legislature to arrest a great and growing evil, by regulating the charges which these warehouses shall demand, and placing them under bonds that they will not violate its provisions.

Great stress is laid on the fact that this warehouse was erected in 1862, long anterior to the passage of the law, and by this kind of legislation the alternative is presented, either to abandon the use of the property for which it was fitted, or to do business for less compensation than its owners had theretofore and always received. In another part of their argument they say that they, by consent of their customers, have received, during the past year, higher rates of storage than those specified in the act, and so, in this respect, the act is a plain, palpable violation of the clause of the constitution relied on—that depriving them of the value of the use, is depriving them of their property.

This argument is answered by what we have already said. It is idle to talk about the consent of their customers to higher rates of charges than this law allows them to receive. Their customers, before this law was enacted, had no protection against these monopolists. They had no consent to give. They were obliged to have their grain taken to these warehouses, and be subjected to such charges as the organized combination, shutting out all competition, might choose to demand. The producer and shipper had no alternative but submission. They were completely in the power of this combination, and it did not fail to demand and exact the highest charges. It is this state of things the law is designed to remedy. One of the first and most imperative duties of the law making power is, to enact all necessary laws to remedy existing evils, taking care, in so doing, not to transgress any constitutional limitation. The means by which to do it most effectually, is in the discretion of the legislature, keeping in

view the provisions of the organic law. This law in no respect affects the title, possession or use of this warehouse by the plaintiffs in error. It deprives them of nothing they owned and possessed at the time of its enactment. Anticipated profits are not. and can not, be held and regarded as property in the ownership or possession of him who owns the article out of which profits are expected to flow. The property is one thing, and remains untouched—the profits are not *in esse,* and can not be claimed as property. When it is said one is deprived of his property, the understanding is, it has been taken away from him—he is divested of title and possession. This provision in the Bill of Rights has never been so construed by the courts of any State whose constitution has such a provision, as to deny to the legislature the power to make all needful rules and regulations respecting the use and enjoyment of property.

Ever since the organization of our State government, the legislature has exercised this power unquestioned. Familiar instances are found in regulating public ferries and public mills, and fixing the compensation in the shape of toll. Another is, in delegating power to municipal bodies to regulate charges of hackmen and draymen, and the weight and price of bread.

But in a property the most eagerly sought after by nearly all classes of community, and deemed the most valuable of any, as it controls all others, the legislative power of every State in the Union has been brought to bear upon it, and no court has ever questioned the right so to do. We allude to the interest laws—laws declaring at what rate a man may loan his money. The argument used here, it seems to us, would prove all these laws unconstitutional, for they do regulate the use of a man's property—they do fix a value upon its use, and, as all observation shows, in most localities, greatly below its market value.

It may be answered, such has ever been the policy of States, and such legislation has become so universal and continuous

as to have familiarized the people to it, and who have adapted their business to its requirements. But here, they say, we were in this business when it was free and unrestricted, and this new policy abridges our gains. It was rightful, they say, to engage in this business, and so to employ our capital that we may make the largest gains out of it.

The interest on money loaned is, by law, six per cent, with the right to contract for ten per cent, and such has been the law for a long series of years. Under the cover of that law, capitalists have engaged in loaning money at those rates. Some, on the strength of it, have erected costly buildings of granite and marble in which to transact their vast business, surrounded by a corps of clerks and other officials, to whom high salaries are paid.

Will any one deny, after this banker has completed his structure, and arranged every thing in profitable working order, that the General Assembly may declare by law that, after the passage of the law, the legal rate of interest shall be four per cent, and it shall be extortion to contract for more than six per cent, and a violation of the law to be punishable by fine or imprisonment, or both, in the discretion of the court. Would the money lender have any right to complain? Would his appeal to this clause in the "Bill of Rights" be listened to for a single moment? Would any court in christendom condemn such an enactment as unwarranted by the fundamental law? The use of money is a matter of the greatest public concern, and that it may be regulated by law has never been authoritatively denied. Kindred subjects, such as public warehouses, public mills, the weight and price of bread, and public ferries, are so connected with the public welfare, that a government destitute of the power to regulate them—to impose such restrictions upon them as may be deemed necessary to promote the greatest good of the greatest number, would be but the shadow of a government, whose blazonry might well be the "cap and bells" and a pointless spear.

We have not remarked upon article 13, under which this law is supposed to have its efficacy, for the reason we hold the law as effectual for all the purposes contemplated by it, and as valid without as with this article. The article itself seems out of place in an organic law, but the convention, however incongruous it may appear, had, undoubtedly, the right to put it there. That body could not withstand the appeals that went up to them from the producers and shippers of the great and indispensable wants of man, and forming the most valuable portion of our staple productions, to provide some remedy against the oppression and extortions to which they were subjected by this organized combination of monopolists, already such a formidable power, with but one heart, and that palpitating for excessive gains.

We place the right to legislate on this subject upon that power, call it by what name you will, inherent in every organized civil government. Every sovereign power possesses, inherently, unrestricted legislative power, where the organic law imposes no restraints.

The power to legislate on all subjects affecting the great interests of a whole community, must be conceded to exist, and it will not cease to exist until civil government shall be resolved into its original elements.

We have nothing to do with the policy of this enactment. That was a question exclusively within the jurisdiction of the General Assembly, which, under no circumstances, has the judicial department a right to question or arraign.

We think what we have said disposes of the other point made by plaintiffs in error, arraigning the law as violative of section 13, of article 2.

There is no taking or damaging private property here, and devoting it to public use. It is an expression of the will of the people through their representatives in the General Assembly, that these seats of oppression and extortion shall be brought into subjection, to the great relief of the people.

We are of opinion the law is a valid, constitutional enactment, and so believing, affirm the judgment of the criminal court.

*Judgment affirmed.*

Mr. Justice Walker: I concur in this decision for reasons stated in a substituted separate opinion.

Mr. Justice McAllister, dissenting:

In 1862, Munn & Scott, the plaintiffs in error, having leased premises for the purpose, as a mere private enterprise, erected thereon the warehouse described in the information, in which to store grain for hire. They then commenced the business of warehousemen, which was continued down to the commencement of this prosecution for carrying it on without a license from the circuit court of Cook county so to do.

It is not disputed that, for the nine years they carried on the business, before July 1, 1871, when the act in question went into force, they held title to the premises, and exercised their employment in accordance with the law of the land, and it is not pretended that they did so under any grant of the legislature, in the nature of a franchise or privilege. Their property was private property; their business was wholly a private enterprise, and their rights in both were necessarily the rights of private property. These propositions can not be successfully controverted.

On account of the views expressed by my brethren, and the conclusion arrived at, it becomes necessary to examine the questions involved in this case upon elementary grounds. All consideration of a franchise being excluded from the case, the matter, so far as it relates to the nature of their rights, may be regarded precisely the same as in the case of any individual insisting upon constitutional protection for rights of private property. The natural rights of individuals are antecedent to and exist independently of the constitution. It is the office of the latter to secure, not to create or bestow them.

Therefore the extent of constitutional protection can only be determined by a correct definition of the rights it was intended to secure.   For that purpose, I shall rely upon one authority alone, as none can question it.

Chancellor KENT says : "The absolute rights of individuals may be resolved into the right of personal security, the right of personal liberty, and the right to *acquire* and *enjoy* property.   These rights have been justly considered and frequently declared by the people of this country to be natural, inherent and inalienable."   1 Kent's Com. (Comstock's ed.) 587.   Again, on the same page, he says : "Right itself, in civil society, is that which any man is entitled to have, or to do, or to require from others, within the limits prescribed by law."

These plaintiffs in error, it must be conceded, had a natural inherent right to acquire the leasehold estate, to erect the warehouse upon it, and employ the same in the business of storing grain for reasonable reward or hire ; and when the act in question went into force, that right was a vested one. As was said by CHASE, Justice, in *Calder* v. *Bull,* 3 Dallas, 394 : "When I say that a right is *vested* in a citizen, I mean that he has the power *to do certain actions,* or to possess certain things according to the law of the land."   And again : "If any one has a right to property, such right is a perfect and exclusive right."

It is to secure these rights that governments are instituted. I can not stop to give even a brief account of the development, or the definition of the natural rights of individuals, as recognized by the common law long before the American revolution, or how the words of Magna Charta became fundamental in all our State governments and incorporated into the constitution of the United States.   I am considering a question now solely under the constitution of this State, the very first section of which, after enumerating the rights of personal security and personal liberty, declares : "To secure these rights *and the protection of property,* governments are instituted

among men," etc.     Then the next section embodies the great
fundamental declaration of Magna Charta, that: "No person
shall be deprived of life, liberty or property without due pro-
cess of law."     Here, it will be perceived, are three subjects,
each expressed by a single word, and respectively answering
to and covering the three absolute natural rights, viz: the
right of personal security, the right of personal liberty, and
the right to *acquire* and *enjoy* property.     It will be further
perceived that the right of property is placed upon the same
footing as the right of personal security and liberty.     And
why, in point of reason and philosophy, should this not be
so?     It must be admitted that the sense of property is deeply
implanted in human nature—is inherent in man; and if we
are to infer a purpose from results, this sense must have been
bestowed for the purpose of rousing mankind from sloth, and
stimulating them to activity, and has, in fact, had far greater
influence in founding civil government upon correct principles
than any other motive or perception of the human mind.     In
the elegant and comprehensive language of Kent: "The
natural and active sense of property pervades the foundations
of social improvement.     It leads to the cultivation of the
earth, the institution of government, the establishment of
justice, the acquisition of the comforts of life, the growth of
the useful arts, the spirit of commerce, the productions of
taste, the erections of charity, and the display of the benevo-
lent affections."

Such being the beneficent influence of the natural sense of
property in forming and animating all the institutions of a
true civilization, the right to its gratification within the limits
of law was regarded as an absolute, natural, inherent right
by the founders of the common law; is included in the funda-
mental doctrines of the Declaration of Independence as among
the inalienable rights of man, and there denominated as the
right to the pursuit of happiness; and, in the bills of rights
in American governments, it is placed upon an equality with

the great natural rights of personal security and personal liberty.

It seems to me palpable, that the views of the majority of the court narrow this right below its proper measure. They hold, that if their private property is not taken, if the title to it is not disturbed, by the act in question, then these parties can not be considered as being thereby deprived of their property, within the meaning of the constitutional inhibition. This seems to me an erroneous view. The Bill of Rights, as I have said, does not create or bestow these natural rights, and has no reference to remedies between man and man, but was intended for the protection of the citizen as against the agencies of the government itself; and that protection was intended to be as broad as the rights protected. The right under consideration is not only to *acquire* but to *enjoy* property.

Our government is one of the people, and its functions subject to disturbance by popular excitements, by which one class of men with certain particular interests or prejudices, either political or otherwise, may come into power, displace all against whom those prejudices run, and oppress them with unfriendly legislation. Suppose the displaced class to be those engaged in agriculture, then laws are passed designed to cripple the interests of those engaged in it. The price of laborers or employees is fixed at a high rate, and maximum prices for all products at low rates. By and by this oppressed class come into power, and they retaliate by singling out the large cities; they prescribe the rates of insurance, a standard for rents; prescribe a schedule of charges for commission merchants, hotel keepers, proprietors of newspapers; and, above all, maximum low prices for all implements to be used by the dominant class. Now, in none of these instances, would property itself be taken or the title to it disturbed; but, can there be any doubt that, by the principles of the Bill of Rights, all such legislation would be unconstitutional

7—69TH ILL.

and void? It was for the prevention of such things that constitutions are adopted.

"When the government," says Cooley, "through its established agencies, *interferes* with the title to one's property, or the *independent enjoyment of it*, and its act is called in question as not in accordance with the law of the land, we are to test its validity by those principles of civil liberty and constitutional defense which have become established in our system, and not by any rules that pertain to forms of procedure merely." Cooley, Const. Lim. 356.

Having given this exposition of the nature and extent of the right of property, which the Bill of Rights was intended to secure against the agencies of the government, let us see whether such right was unconstitutionally invaded by the act in question. Before proceeding to that inquiry, it is proper to state that there is no question arising which has any reference to the power of eminent domain or taxation.

The act singles out from all the establishments of the State of a similar character the grain warehouses in Chicago. It arbitrarily fixes the maximum rates of hire or reward to be received by the proprietors, and forbids them from contracting with customers for any higher rate. It then prohibits, under severe penalties, the continuance of the business, unless they shall first apply for and obtain a license to carry it on, from the circuit court of the county, in the manner prescribed, and enter into bond, with sureties, to be approved by such court, in the penal sum of $10,000, conditioned for a full and unreserved compliance with all laws of the State respecting their business, including, of course, that fixing the maximum rate of hire or reward—for breach of which their license may be revoked, their business made criminal and stopped, and themselves and sureties liable on their bond. As was justly said by Mr. Justice JOHNSON, in the Supreme Court of the United States: "Licensing acts, in fact, in legislation are universally restraining acts; as, for example, acts

licensing gaming houses, retailers of spirituous liquors, etc."
*Gibbons* v. *Ogden,* 9 Wheat. 232.

The proposition is, it seems to me, too plain for argument,
that the nature of the power over the business of warehouse-
men of grain in the city of Chicago, here assumed by the
State, is one of suppression—of destruction. For, if the legis-
lature can fix the rate of compensation, then make it criminal
to prosecute the business unless they shall obtain a license to
carry it on, and give the bond required to submit to the rate
so fixed, then the power is limited only by the pleasure of the
State, and it may fix the rate of compensation so low that the
business can not possibly be continued under it, and is there-
fore suppressed—destroyed. This is purely a question of
power. "Questions of power," says Chief Justice Marshall,
"do not depend on the *degree* to which it may be exercised.
If it may be exercised at all, it must be exercised at the will
of those in whose hands it is placed." *Brown* v. *State of Mary-
land.* 12 Wheat. 439.

This principle was illustrated in the case of *McCulloch* v.
*State of Maryland,* 4 Wheat. 316, where it was not claimed
that the particular tax levied by the State upon the United
States Bank would destroy or even embarrass that institution,
but the validity of the act was assailed wholly upon the nature
of the power involved in it; and the central idea of Chief
Justice Marshall's opinion was, that a power to tax was, a
power to tax limited only by the pleasure of the State, and
that it was, therefore, a power to destroy. So here, the power
to fix the maximum rates of compensation, and make the
continuance of the business criminal unless the parties will
submit to such rates, procure license, and give the bond—a
power whose exercise is limited only by the pleasure of the
State as to what that rate shall be—is necessarily a power to
destroy a business which had been carried on for nine years,
according to the law of the land, and in which these parties
had vested rights. I insist that they could not be deprived
of these rights except by due process of law. The legislature

had no more power to accomplish the destruction of such business, and deprive them of the use of their property, by such indirect modes, than by a direct fiat to require the sheriff of the county to burn their warehouse.

The majority of the court seem to place their conclusion, in part, upon the ground that these parties exercised a public employment, and were therefore subject to the police power of the State. We had occasion in *The Town of Lake View* v. *Rosehill Cemetery,* Sept. T. 1873, to examine somewhat into the nature of that power when resorted to as a color for subverting private rights of property, and there held that it could not be invoked to sustain legislation which invaded private rights—where the police power was but a mere color for such invasion.

But these parties did not exercise a public employment. Such was not the character given to their business by the common law. In *Coggs* v. *Bernard,* 2 Ld. Raym., the leading case on the subject of Bailments, Chief Justice HOLT, in his celebrated judgment, says : "As to the fifth sort of bailments, viz : a delivery to carry or otherwise manage, for a reward, to be paid to the bailee, those cases are of two sorts : either a delivery to one that exercises a public employment, or a delivery to a private person. First, if it be to a person of the first sort, and he is to have a reward, he is bound to answer, at all events ; and this is the case of the common carrier, common hoyman, master of a ship," etc. This degree of liability, viz : to answer at all events, attaches by the common law in this country only to common carriers and innkeepers. It does not attach to warehousemen. Hence, we find that Mr. Justice Story, in classifying bailments *locatio custodiæ,* or deposits for hire, puts agisters of cattle, *warehousemen* and wharfingers together as those whose obligations would fall under the same rule. Story on Bailments, (8 ed.) sec. 442. Warehousemen are bound only to take common and reasonable care of the commodities entrusted to their

charge, id. sec. 444, while common carriers and inn-keepers are insurers, because they exercise a public employment.

Their business was, therefore, simply that of warehouse-men. Such was the character given to it by the common law, and in which they had vested rights for nine years anterior to this act. This being so, it was not within the power of the State government, by any declaration, either through a constitutional amendment or the legislature, to change the character of such business, so as to subject it to legislative control, in the nature of a power of suppression. Because a convention is assembled to amend the constitution, no individual is thereby subject to be deprived of vested rights. The great fundamental principles of a republican form of government continue in force during such conventions, and are not superseded by an amendment of the constitution. Besides, the constitution, as amended by the introduction of the article concerning warehouses, in nowise contemplated or authorized the assertion of the power of suppression.

But there is another view in which it is clear the legislature transcended its power, by this act.

The Chicago river, running west from its connection with Lake Michigan about a mile, and then dividing into two branches, one north and the other south, running through the city, forms the port of Chicago. The warehouse in question, and probably all others at which this statute was aimed, are situated upon this port, and constitute the direct and indispensable accessories to commerce in grain upon the great lakes, between that port and other States. And the question arises, can these accessories to such commerce be suppressed by the State government? The States have ceded, by express grant in the federal constitution, to the government thereby organized, the power "to regulate commerce with foreign nations and among the several States." The power, therefore, to regulate inter-State commerce is gone from the several States, and vested exclusively in Congress, especially after it has been exercised by the latter. *Gibbons*

v. *Ogden,* 9 Wheat. 1 ; *Steamboat Co.* v. *Livingston,* 3 Cow. R.
743 ; *Thurber* v. *The People,* 13 Ill. 535 ; 5 Howard R. 573.

The power to regulate commerce upon the great lakes has
long since been exercised by Congress.   If these grain ware-
houses be in fact, as doubtless they are, the direct and in-
dispensable accessories to commerce in grain upon the lakes,
and between the port of Chicago, and ports in other States,
will it be said that this State can exert a power over them
whose very nature is that of suppression—of destruction?   Can
the State, by her legislative authority, suppress all commerce
in grain upon the lakes between Chicago and the Eastern
States, when not necessary to the preservation of the morals,
health or safety of the community ?   If not, then how can it
restrain and destroy the very means by which alone that com-
merce may be carried on with the conveniences suitable to
the activity of the age ?

This power in Congress to regulate commerce among the
several States, is contained in the same grant as that to regu-
late it with foreign nations, and is placed upon identically
the same footing.   Now, suppose the legislature of New York
should pass an act like this, designed and directed against all
warehouses in the city of New York engaged in receiving,
storing and discharging all commodities, whether imports or
exports, brought within the channels of such commerce.   These
warehouses, it must be conceded, are as directly employed in
that commerce, and as indispensable to it, as the vessels upon
which it is borne from port to port.

The act, it will be perceived, operates directly upon the
entire business of warehousemen.   The component parts of
that business are various transactions, in which the carrier
and the merchants engaged in such commerce, as well as the
warehousemen, are directly interested.   So far, therefore,
as it operates upon the business, it must upon all these
various transactions forming its component parts, and it pre-
scribes rules by which they must be governed, or cease alto-
gether.   This could be nothing more nor less than an attempt

to regulate foreign commerce, as a direct exercise of such power, without reference to any police power. The act was not necessary to the preservation of the health, the morals, or the safety of the community, which are the true purposes of the police power; but its purpose was to compel the warehousemen to conduct their business upon a compensation prescribed by the State.

As was said by Mr. Justice McLean, in 5 Howard, 592: "Under the pretense of a police regulation, a State can not counteract the commercial power of Congress."

It seems to me the cases are parallel, and the act void.

Mr. Justice Scott: I can not concur in the reasoning or conclusions of the majority of the court, but do concur in the views presented by Mr. Justice McAllister in his dissenting opinion.