## THE PEOPLE OF THE STATE OF ILLINOIS

*v.*

## WILLIAM H. HARPER et al.

1. INSPECTION OF GRAIN—*delegation of power in respect thereto.* There is no provision of the constitution which, either expressly or by necessary implication, inhibits the General Assembly from committing the inspection of grain to a board created for that purpose. The right to pass inspection laws belongs to the police powers of the government, and the legislature has authority to arrange the distribution of such powers as the public exigencies may require, apportioning them to local jurisdictions to such extent as the law-making power deems appropriate, and committing the exercise of the residue to officers appointed as it may see fit to ordain.

2. So it was competent for the General Assembly to delegate to the Railroad and Warehouse Commission the power to control the subject of the inspection of grain.

3. SAME—*as to fees to be paid.* The expenses occasioned by the inspection of grain may be required to be borne by those presumably benefited by it. Fixing fees for such services, and prescribing the manner of their collection, and upon whom they shall be imposed, do not fall within the constitutional limitation concerning the imposition of a local burden by way of taxation.

4. SAME—*delegation of the power to fix inspection fees.* It is within the legislative power to invest the Railroad and Warehouse Commission with authority to prescribe what fees shall be charged for grain inspection, and to regulate them from time to time as circumstances may require. The delegation of this legislative function may well be regarded as a necessary incident to the exercise of this branch of the police power of the government.

5. SAME—*constitutional requirement that fees and salaries shall be fixed by law.* The officers in respect of whom the constitution speaks of fees and salaries fixed by law, are only those specifically named in that instrument, and do not embrace officers appointed under the inspection laws of the State.

6. SAME—*inspection law as a local and special law.* Although the statute concerning the inspection of grain in the city of Chicago is, in a certain sense, a local and special law, it is not within the inhibition of any provision of the constitution on that account. Local or special laws are only prohibited in the enumerated cases in sec. 22, art. 4 of the constitution, and "laws for the inspection of grain" are not included.

7. Besides, the constitution itself, in sec. 2, art. 13, discriminates between public warehouses in cities of not less than 100,000 inhabitants and those in cities of less population, and recognizes that there is a necessity for regulations in respect to the former not necessary to the latter.

8. SAME—*inspection laws are not regarded as imposing burdens upon trade,* nor as unjustly discriminating in favor of one class at the expense of another, so long as they are reasonable. The law of this State, on that subject, is not liable to the objection of unconstitutionality on this ground.

9. OFFICIAL BOND *of chief inspector of grain—extent of liability of sureties.* The official bond of a chief inspector of grain was conditioned that the principal should well and strictly discharge the duties of his office, according to law and the rules and regulations prescribing his duties, and pay all damages to any person or persons injured by his neglect, etc. The Board of Railroad and Warehouse Commissioners, under a power given them by statute, fixed the duties of his office before the execution of the bond, requiring him to collect inspection fees and disburse them, and pay over any balance in his hands to his successor: *Held,* that the sureties were liable for moneys in the hands of their principal at the close of his term of office which he failed to pay over to his successor, and that the undertaking was not confined to the payment of damages to any person or persons injured by his neglect. In such case the sureties must ascertain the duties so imposed upon their principal, or bear the consequences.

10. ·Although the Board of Railroad and Warehouse Commissioners are only authorized to fix the fees for the inspection of grain at such rates as may be necessary to meet the expenses of the service, yet, if a sum in excess of that required for the payment of expenses is accumulated in the hands of the chief inspector at the close of his term, he and his sureties are liable upon his official bond for his neglect or refusal to pay over such excess to his successor in office.

11. SAME—*recovery against principal not necessary to suit on bond.* It is not necessary to recover judgment against an officer for his default before bringing suit on his bond.

12. PARTY—*at law, in suit on official bond of inspector.* The people of the State of Illinois, as the payees in the official bond of a chief inspector of grain, are proper parties plaintiff in a suit upon such bond, although the sum recovered must be paid into the inspection fund for which it was originally received by the inspector.

13. PLEADING—*declaration on official bond.* Where the term of a party's office was limited to two years from his appointment, in a suit upon his bond for not paying over moneys in his hands to his successor, the declaration showed the date of the expiration of the term of the obligor in the bond, and the date of the appointment of his successor, without showing the qualification of the latter, and alleged the duty of the obligor to pay over to such successor, it was *held,* that the allegation of the expiration of the party's term of office, and the appointment of his successor, to whom he failed to pay over such moneys, was sufficient.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. HENRY BOOTH, Judge, presiding.

This was an action of debt on the bond of William H. Harper, as chief inspector of grain for the city of Chicago. The declaration is as follows:

"The people of the State of Illinois, plaintiffs herein, by Luther Laflin Mills, State's attorney of Cook county, and James K. Edsall, Attorney General of Illinois, their attorneys, complain of William H. Harper, William Harper, Robert G. Ingersoll, John M. Rountree, Charles B. Farwell, and Solomon P. Hopkins, defendants herein, of a plea that they render to the said plaintiffs the sum of $50,000, which they owe to and unjustly detain from plaintiffs.

"For that, whereas, the said William H. Harper, heretofore, to-wit, on the 3d day of April, A. D. 1873, was duly

appointed and commissioned by the then Governor of said State of Illinois, by and with the advice and consent of the Senate of said State, to the office of chief inspector of grain in and for the city of Chicago, in said Cook county, for the term of two years, and that he, the said William H. Harper, then and there accepted the said appointment and commission to said office, and entered upon the duties thereof; and that the said William H. Harper, as principal, and the said William Harper, Robert G. Ingersoll, John M. Rountree, Charles B. Farwell, and Solomon P. Hopkins, as sureties, afterwards, to-wit, on the 24th day of September, A. D. 1873, executed and delivered to the said plaintiffs, as the official bond of said William H. Harper, as such chief inspector, the bond herein-after described, that is to say : that on the day and year last aforesaid, in the county aforesaid, the said defendants, by their writing obligatory, bearing date of that day, and sealed with their seals, did acknowledge themselves to be held and firmly bound to said plaintiffs in the penal sum of $50,000, to be paid to said plaintiffs,—which said writing obligatory was and is subject to a certain condition thereunder written, whereby, after reciting to the effect that the said William H. Harper had been appointed chief inspector of grain for the city of Chicago, it was provided, that if he, the said William H. Harper, should faithfully and strictly discharge the duties of said office of chief inspector of grain according to law and the rules and regulations prescribing his duties, and pay all damages to any person or persons who might be injured by reason of his neglect or failure to comply with the laws and the rules and regulations aforesaid, then said writing obligatory was to be void, otherwise to be and remain in full force and effect, as by the said writing obligatory and the said condition thereof appears.

"And the plaintiffs aver that, to-wit, on the 4th day of November, A. D. 1873, the Board of Railroad and Warehouse Commissioners of the State of Illinois approved and accepted the said writing obligatory, and the sureties therein, as the

official bond of the said William H. Harper, as such chief inspector of grain; and that the said William H. Harper continued to act as such chief inspector until the expiration of the term for which he was so appointed, to-wit, until the 3d day of April, A. D. 1875, and that afterwards, to-wit, on the 24th day of April, 1875, John C. Smith was duly appointed to the office of chief inspector of grain in and for the said city of Chicago, and thereby became, and from thence hitherto has been, the successor of the said William H. Harper in said office.

"And the plaintiffs further aver, that before the making of the said writing obligatory, to-wit, on the 8th day of May, A. D. 1873, the said Board of Railroad and Warehouse Commissioners, in pursuance of the statute in such case made and provided, made and adopted certain rules and regulations prescribing the duties of such chief inspector of grain, of the tenor and effect following, to-wit:

"'Rule 4. The said chief inspector is hereby authorized to collect such charges for the inspection of grain as may be established from time to time by the commissioners, and pay out the proceeds arising therefrom, as hereinafter provided; and he shall turn over to his successor in office all moneys, uncollected bills, or other property belonging to the inspection department, taking his receipt therefor.'

"'Rule 15. The said chief inspector shall make out and transmit to the office of the commissioners, previous to the first Tuesday of each month, a full and correct statement, in duplicate, of the amount of cash receipts from any and all sources during the previous month; also, the amount of uncollected bills due the department. Said statement shall also include an account of the expenses of the department for the same month, and be accompanied by the bills of said expenses, duly certified by the chief inspector or the warehouse registrar to be correct, and the pay-roll, giving the names and duties of all employees in the offices of the inspector and registrar, and the amounts due each, duly certified as above. Upon the

approval of the said bills and pay-roll by the commissioners, and the return of the same to the chief inspector, he is hereby authorized to pay such bills and pay-roll, thus approved, out of any funds belonging to his department, and, as soon thereafter as practicable, return said pay-roll and bills, duly receipted, to the office of the commissioners.'

"And that said rules and regulations continued in force from the date last aforesaid, during the time the said William H. Harper so continued to act as such chief inspector of grain, and from thence hitherto.

"And the plaintiffs further aver, that before the making of the said writing obligatory, to-wit, on the 8th day of May, A. D. 1873, and from time to time thereafter, the said Board of Railroad and Warehouse Commissioners, in pursuance of the statute in such case made and provided, fixed and regulated the rates of charges for the inspection of grain in such manner as would, in the judgment of said commissioners, produce sufficient revenue to meet the necessary expenses of the service of inspection, and no more.

"And the plaintiffs further aver, that by virtue of the premises it became and was the duty of the said William H. Harper, as such chief inspector of grain, during his said term of office, and his continuance in said office, to inspect grain in the said city of Chicago, or cause the same to be inspected, and to collect and receive the lawful fees and charges for such inspection fixed by said Board of Railroad and Warehouse Commissioners, in accordance with the said rules and regulations of said board in that behalf, and to make monthly reports to the said board of commissioners of all such fees collected and received by him, and to pay out the same in defraying the expenses of said inspection service in the manner prescribed in said rules and regulations and the statute in such case made and provided, and after the expiration of his said official term to turn over and deliver to his successor in said office of chief inspector, all such moneys and other property in his hands

belonging to such inspection department, as provided in said rules and regulations defining his duties in that regard.

"And for assigning a breach of the said condition of said writing obligatory, the plaintiffs aver that the said William H. Harper, after the making of the said writing obligatory, and during and before the expiration of his said term of office, as aforesaid, as such chief inspector, collected and received large sums of money, of such fees, for the inspection of grain, as aforesaid, amounting to a large sum, to-wit, the sum of $25,000, over and above all sums paid out by him in defraying the expenses of said inspection service, and without right or authority of law converted and disposed of the same to his own use, and, although requested so to do upon the expiration of his said term of office, hath neglected and refused to turn over and deliver said sum of money so remaining in his hands to his successor in office as such chief inspector, and still doth neglect and refuse so to do, and without lawful right still retains the said sum to his own use, to-wit, at the place aforesaid.

" By means whereof an action hath accrued to the plaintiffs to demand, have and receive of and from said defendants said sum of $50,000, above demanded.  Yet, the said defendants have not paid to said plaintiffs the said last named sum of money, or any part thereof, but refuse so to do, to the damage of said plaintiffs of the sum of $40,000, and therefore the plaintiffs bring suit."

The defendants demurred to the declaration on the ground that the statute under and by which the Board of Railroad and Warehouse Commissioners assumed to act and establish the rules in the declaration mentioned, and so far as it authorizes the appointment of the chief grain inspector and authorizes said board to establish rules for the inspection of grain and the imposition of fees and charges therein on such inspection, is invalid.  The court sustained the demurrer, and the people electing to stand by their demurrer, gave judgment for the defendant.

The people bring the case here by writ of error.

The only error assigned is, that of sustaining the demurrer to the declaration.

Mr. JAS. K. EDSALL, Attorney General, for the People.

Messrs. ROOT & ARRINGTON, and Mr. R. G. INGERSOLL, for the defendants in error.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The points urged against the sufficiency of the declaration are :

1. The authority granted to the Railroad and Warehouse Commissioners to fix the rates of charges for the inspection of grain and compensation of officers, is an unwarrantable delegation of legislative power.

2. The act is void, so far as it attempts to classify warehouses into classes A, B and C, and provide for the appointment of an inspector in cities where is located a warehouse of class A, because it is special and local.

3. The General Assembly is not authorized, directly or indirectly, to impose burthens, for specific purposes, upon grain and produce, and so the inspection fees are illegal.

4. It is an imposition, a burthen, levied in a manner and by officers not authorized by the constitution.

5. The condition of the bond is not broad enough to hold the principal or sureties for the fees collected, as the bond is a guaranty only against a misinspection of grain.

6. The accumulation of a surplus was unwarranted by law, and the sureties are not liable for the same.

These will be considered in the order in which they are presented.

1st. The constitution, art. 13, § 7, requires that " the General Assembly shall pass laws for the inspection of grain, for the protection of producers, shippers and receivers of grain and produce." No system is prescribed, and the General

Assembly is, therefore, left to the exercise of its discretion in the enactment of statutes, in compliance with this mandate.

By "An act to establish a board of railroad and warehouse commissioners and prescribe their powers and duties," in force July 1, 1871, a commission, styled "Railroad and Warehouse Commission," is created. It is composed of three persons, appointed by the Governor, by and with the advice and consent of the Senate, and the term of office is for two years and until their successors are appointed and qualified. Rev. Stat. 1874, p. 828, § 129.

In addition to the duties imposed on this commission in reference to railroad corporations, by § 14 of "An act to regulate public warehouses, and the warehousing of grain, and to give effect to art. 13 of the constitution," the Board of Commissioners of Railroads and Warehouses are empowered " to fix the rate of charges for the inspection of grain, and the manner in which the same shall be collected," and also " to fix the amount of compensation to be paid to the chief inspector, assistant inspector, and all other persons employed in the inspection service, and prescribe the manner and time of their payment." The chief inspector is appointed by the Governor, by and with the advice and consent of the Senate. Assistant inspectors and other employees are appointed by the Board of Commissioners of Railroads and Warehouses, upon the nomination of the chief inspector; and that board is also empowered to appoint a warehouse registrar and such assistants as may be deemed necessary. The entire inspection is expressly placed under the supervision and control of the Board of Railroad and Warehouse Commissioners. "All necessary expenses incident to the inspection of grain, and to the office of registrar, economically administered, including the rent of suitable offices, shall be deemed expenses of the inspection service, and shall be included in the estimate of expenses of such inspection service, and shall be paid from the funds collected for the same."

The charges for inspection are required to " be regulated in

such a manner as will, in the judgment of the commissioners, produce sufficient revenue to meet the necessary expenses of the service of inspection, and no more."

That the board thus created is a *quasi* public corporation, admits of no controversy. Angell & Ames on Corporations, §§ 23, 24; Dillon on Municipal Corporations, § 9. And it is now too late to question the power to create such agencies in the administration of the government, and invest them with such legislative power as shall be appropriate and necessary to effectuate the objects of their creation. Cities, towns, villages, counties, townships, road districts and school districts are familiar instances of local, corporate and *quasi* corporate agencies in the administration of the government, invested with powers to some extent of a legislative character. Besides these, and of a different character of public agencies, are boards for the control of the public charitable, penal and reformatory institutions, and that for the construction, management and operation of the Illinois and Michigan canal, — all of which have been and are invested with power and authority to make contracts, fix prices, and adopt such rules, regulations and by-laws as shall be reasonably adapted to and necessary to carry out the purposes of their creation. And the last named board, since the act in relation to the construction, etc., of the canal, approved January 9, 1836, has been invested with and exercised the power of making rules, regulations and by-laws for fixing tolls to be paid for transportation, for governing persons employed about the canal, for injuries done to the canal, locks and tow-paths, and for the management and navigation of the canal. 1 Purp's Stat. 432, § 75; id. 467, § 261; Rev. Stat. 1874, 189, § 98. During this period, now nearly forty years, although the people have twice remodeled their constitution, this delegation of legislative power has neither been condemned by the people nor questioned by the courts.

And, as further illustrative of the principle, reference may be also had to the corporations created for park purposes, which are invested with extensive legislative powers and the com-

missioners of which we have said "are agents, by whom in part the people of the State carry on the government. Their functions are essentially political, and concern the State at large, although they are to be discharged within certain local limits. *Wilcox* v. *The People,* 90 Ill. 192. See also, *Chicago* v. *Wright,* 69 id. 318.

The right to pass inspection laws belongs to the police power of the government. Cooley's Const. Limitations (1st ed.) 584–5. Inspections are necessary incidents to the execution of quarantine and health laws, and laws to prevent fraud, imposition and extortion in quality or quantity in sales; and the power to provide for them has been uniformly recognized as the subject of delegation to municipal corporations. Cooley's Const. Limitations, *supra;* Sedgwick on Stat. and Const. Law, 463.

If, therefore, the power here conferred upon the Railroad and Warehouse Commissioners had been conferred upon the city council of Chicago, the objection that it involved a delegation of legislative power, would have been, to the apprehension of all, destitute of any plausible basis.

But, it was said in *The People ex rel.* v. *Salomon,* 51 Ill. 50: "There is no prohibition which we have been able to discover, and we have been pointed to none, against the creation by the legislature of every conceivable description of corporate authority, and when created to endow them with all the faculties and attributes of other pre-existing corporate authority. Thus, for example, there is nothing in the constitution of this State to prevent the legislature from placing the police department of Chicago, or its fire department, or its water works, under the control of an authority which may be constituted for such purpose by a vote of the people, and endow it with power to assess and collect taxes for their support, and confide to it their control and government." Again, it was said: "The constitution nowhere commits corporate objects or purposes irrevocably to authorities now existing, nor does it prohibit the committal of them to such corporate authority as may be

called into life by the same law which creates the subject, and commits it to their jurisdiction."

In *The People* v. *Draper*, 15 N. Y. 532, a like principle is announced. It was there held : "The legislature may, constitutionally, establish new civil divisions of the State, embracing the whole or parts of different counties, cities, villages or towns, for general purposes, permanent or temporary, of civil government, provided the divisions recognized by the constitution are not abolished, nor their capacity impaired, to subserve the purposes and arrangements to which they are made instrumental by the constitution." See also, to the same effect, *Police Comrs.* v. *City of Louisville*, 3 Bush, 597.

And again, in *The People* v. *Shepherd*, 36 N. Y. 285, it was held the legislature has authority to arrange the distribution of police powers, " as the public exigencies may require; apportioning them to local jurisdictions to such extent as the law-making power deems appropriate, and committing the exercise of the residue to officers appointed as it may see fit to ordain." See also, *People* v. *Pinckney et al.* 32 N. Y. 377.

Analogous principles have been recognized by this court in *Bush* v. *Shipman*, 4 Scammon, 186; *Trustees, etc.* v. *Tatman*, 13 Ill. 27; *County of Richland* v. *County of Lawrence*, 12 id. 1.

Where it is sought to impose burdens upon municipal or *quasi* municipal corporations to be discharged by revenues raised by taxation on the local constituency, under the constitution, the burden can only be imposed by the local corporate authorities—as held in *Harward et al.* v. *St. Clair Drainage Co.* 51 Ill. 130, and other cases of kindred character; and the corporation can not be imposed upon the locality without its consent signified by a majority vote of its electors, as held in *People ex rel.* v. *Salomon, supra.*

But this is a protection against taxation, only, and not a limitation upon the powers of the State government in selecting agencies through which to protect the people against wrong and injustice, where no local burden is sought to be imposed. .

No taxation is imposed on any locality by this law; and the power to be exercised is solely for the benefit of commerce in grain which is necessitated to pass through a particular channel, exposing producer, shipper and receiver to the danger of loss through imposition, extortion and fraud, and it can, in no proper sense, be deemed a burden upon the locality. ·

There is no provision of the constitution which, either expressly or by necessary implication, inhibits the General Assembly from committing the inspection of grain to a board created for that purpose; and we are not authorized to say that the Board of Commissioners of Railroads and Warehouses is not quite as legitimate as any other board that could have been selected or created for that purpose.

It evidently was not designed that the inspection should be made a source of revenue, either to the State or to municipalities; for it is not enjoined as a means of raising revenue, but solely for the " protection of producers, shippers, and receivers of grain and produce;" and there is natural justice in requiring that the expenses occasioned by the inspection should be borne by those presumably benefited by it. Certainly no clause of the constitution is violated by this requirement.

The principle, repeatedly recognized by this and other courts of last resort, that the General Assembly may authorize others to do those things which it might properly, yet can not understandingly or advantageously do itself, seems to apply with peculiar force to the fixing of the amount of inspection fees—so as to adjust them properly with reference to the expenses of inspection.

The expenses of inspection must necessarily vary, to some extent, from time to time, with the changes in the price of labor, office rent, fuel, lights, stationery, etc., and the amount to be received at a given rate per cent for inspection fees must also necessarily vary in proportion as the quantity of grain to be inspected, from time to time, increases or diminishes. And hence an arbitrary permanent rule, as one by

24—91 ILL.

statute would have to be, would be liable either to produce less than the inspection expenses demanded, or an excess which would not be needed, and which would therefore, to that extent, be an unjust imposition on those paying the fees.

It would seem obvious that anything like a fair approximation to an adjustment of the fees to the expenses could only be made upon thorough local knowledge, and by changing the rate per cent of fees to be paid, from time to time, and as often as experience should prove to be necessary to correspond with changes in expenses and the fluctuations in the quantity of grain to be inspected.

The delegation of this legislative function may therefore well be regarded as a necessary incident to the exercise of this branch of the police power of the government; and the reasoning which sustains a like delegation to a city council must be of equal potency here. We can not say we are clearly satisfied the constitution has been thereby violated.

The officers in respect of whom the constitution speaks of fees and salaries fixed by law, are only those specifically named in that instrument. *Davis* v. *The State,* 7 Md. 161.

2d. It may be conceded that the statute under consideration is local and special, as, in a certain sense, it is, without bringing it within the inhibition of any provision of the constitution. Local or special laws are only prohibited in the enumerated cases in sec. 22, art. 4, of the constitution, and "laws for the inspection of grain" are not included. Besides, the constitution itself, in sec. 2, art. 13, discriminates between public warehouses in cities of not less than 100,000 inhabitants, and those in cities of less population, and recognizes that there is a necessity for regulations in respect to the former not necessary to the latter.

The difficulties that may be encountered in the practical execution of a law are never regarded as of controlling significance in determining its constitutionality.

3d. Inspection laws are not regarded as imposing burdens upon trade, nor as unjustly discriminating in favor of one

class at the expense of another, so long as they are reasonable. That the statute before us is not liable to the objection of unconstitutionality on this ground is sufficiently shown by the reasoning in *Munn et al.* v. *The People*, 69 Ill. 80, and *Munn* v. *Illinois*, 94 U. S. (4 Otto) 113.

4th. The objection that the inspection fee is a burden levied in a manner and by officers not recognized by the constitution, is based upon a misapprehension.

Inspection fees are not taxes, nor is the right to impose them to be found under the power to impose taxation. They are imposed as compensations for services rendered presumably beneficial to the party upon whom they are imposed under and by virtue of the general police powers of the State. Cooley on Taxation, 413; *Charleston* v. *Rogers*, 2 McCord, 495.

It is somewhat significant that all objections to the burdensome and oppressive character of these fees come not from those by whom they were paid, but from the man who has confessedly appropriated them to his own use and those who are sought to be held liable for his appropriation as his sureties.

5th. In *The People* v. *Tompkins et al.* 74 Ill. 482, when the chief inspector's bond was executed the Commissioners of Railroads and Warehouses had not designated the chief inspector as the collector of the inspection fees and custodian of the fund when collected, and we held that his sureties were not chargeable with knowledge by the law that he would be required to collect and have the custody of the fund. But we said, " Had the duty been enjoined upon Tompkins, as chief inspector, when the bond was executed, to collect this fund and retain its custody, a different and much stronger case in favor of the plaintiffs would have been presented," and we declined an expression of what we would have held in that event.

In the present case, the chief inspector was designated and appointed as collector of the inspection fees and charged with the custody of the fund thus raised, and required to make

payment on bills chargeable to the inspection service, and of the residue in his hands to his successor in office, when the bond in suit was executed.

The statute declares, that " the chief inspector of grain and all assistant inspectors of grain, and other employees connected therewith, shall be governed in their respective duties by such rules and regulations as may be prescribed by the Board of Commissioners of Railroads and Warehouses; and the said board of commissioners  *  *  *  shall also have power to fix the rates of charges for the inspection of grain, and the manner in which the same shall be collected." When rules and regulations were adopted, in conformity with the statute, they became just as much the law describing and regulating the duties of the chief inspector as if they had been expressly enacted as a part of the statute, and the undertaking of the bond is, that the said William H. Harper shall "faithfully and strictly discharge the duties of said office of chief inspector of grain according to law, and the *rules and regulation prescribing his* duties," etc.

We do not think it admissible to say, as contended by counsel for defendants, that the undertaking here is simply that the chief inspector will pay all damages to any person or persons who may be injured by reason of his neglect. This view entirely excludes the preceding sentence, which requires that he shall " faithfully and strictly discharge the duties of his said office of inspector, according to law and the rules and regulations prescribing his duties," which constitute all that is needed to a complete official bond. The next clause is then inserted, not as a limitation upon, but as an addition to, this undertaking, and must so be construed.

When, therefore, the bond was executed, the law gave notice that power was given the commissioners to prescribe and regulate the duties of the chief inspector in his office. Those duties were prescribed, and it devolved upon those guaranteeing their performance to ascertain what they were. If the sureties did not know, when they signed the bond, that it

was the duty of the chief inspector to collect inspection fees, pay them out from time to time, as the inspection service demanded, and pay over the residue to his successor in office, it was their own folly. The means of information were before them, and they can not be heard to say they did not know what they ought to have known.

The undertaking of the sureties is, that their principal shall faithfully and strictly discharge the duties of his office of chief inspector, as well those prescribed by the Commission of Railroads and Warehouses as those prescribed by law. It was no less his duty to pay over the surplus inspection fees in his hands to his successor in office, than it was to make careful and honest inspections, and for this default, his sureties are, in our opinion, clearly responsible.

6th.   We think it clear the statute does not contemplate the accumulation of a large and constantly increasing fund to be derived from inspection fees, and that the fund thus collected shall be only sufficient to meet the demands of the inspection service.   This is substantially its language.   But it must have a reasonable construction, and, in giving it such construction, it is obvious that there must be accumulations of fees in the hands of the chief inspector amounting to considerable sums and varying at different times according to circumstances.   It is impracticable that the inspection fees for each bushel, or even each car load of grain, shall go directly from the hands of the party paying them into the hands of those having claims upon the fund.   The amount of the fees must necessarily be fixed in advance of their collection, and while, with proper care by the board of commissioners, the general demand upon the inspection fund may be anticipated with a reasonable approximation to exactness, it is very evident that the amount of fees to be received, may, by reason of sudden and exceptional fluctuations in the shipments of grain, sometimes fall far below a reasonable anticipation, and at other times rise as much in excess of it.

There is nothing in the record before us from which we can

determine that the balance in Harper's hands is, in fact, even if we regarded that as material, in excess of the inspection service. For aught that appears, through his negligence in paying bills, or otherwise, there may be ligitimate demands upon the fund to cover every dollar of it.

But we do not regard this as important. From the mode of collecting the fund, and the nature of the claims upon it, we think the only reasonable conclusion is that it must have been anticipated some amount would accumulate in his hands, greater or smaller as circumstances might affect it. The rules and regulations of the Railroad and Warehouse Commissioners contemplated there might be a surplus in his hands, which they made it his duty to pay over to his successor. The sureties undertook that he should discharge this duty, and in doing so, having before them knowledge of the purpose of the fund, the source from which it was to be raised and all the circumstances that might affect it, they voluntarily took the chances of the amount. It does not lie with them to say that it is larger than it ought to be. If those for the benefit of whom the inspection was made, without protest and voluntarily paid money as inspection fees to Harper, it lawfully became a part of the inspection fund, and as such must be accounted for.

There are ample means known to the law by which the amount to be raised by inspection fees can be restrained within reasonable limits, and we doubt not they will speedily be found by producers, shippers, etc., and by those representing the State, when any necessity therefor shall exist.

We see no objection to the parties. The people, as payees, are proper plaintiffs, though the balance due, when collected, must be paid into the fund for which the fees were originally collected.

The averment is that Harper acted as chief inspector of grain until the expiration of the term for which he was so appointed, to-wit, until the 3d day of April, 1875, and that afterwards, to-wit, on the 24th day of April, 1875, John C.

Smith was duly appointed to the office of chief inspector of grain in and for the said city of Chicago, and thereby became and from thence hitherto has been the successor of William H. Harper in said office. The term of office of the chief inspector is limited to two years, not until his successor shall be elected and qualified. We therefore think the allegation here is sufficient as to the expiration of Harper's term of office, and since his duty was to pay to his successor, without other qualification to that term, it is sufficiently averred that he had a successor, to whom he has failed to pay over the moneys in his hands after demand made for that purpose.

The objection that judgment should have been obtained against Harper for his default, before suit could be brought on his bond, is without merit.

Harper was bound either to pay the money he had received to his successor, or lawfully account for its disposition, and having done neither, a liability is sufficiently established against him and his sureties upon his bond. (Rev. Stat. 1874, p. 730, § 13.) *Comrs.* v. *The People,* 76 Ill. 390.

The judgment is reversed and the cause remanded.

*Judgment reversed.*

Mr. JUSTICE DICKEY, dissenting: I think the sureties undertook for the proper discharge of Harper's duties *as inspector,* and did not contract for his fidelity *as treasurer.*