In the Matter of the TRUSTEES OF THE VILLAGE OF SARATOGA SPRINGS, Respondent, v. THE SARATOGA GAS, ELECTRIC LIGHT AND POWER COMPANY, Appellant.

1. GAS AND ELECTRICITY — CONSTITUTIONALITY OF STATUTE (L. 1905, CH. 737) CREATING COMMISSION TO FIX THE MAXIMUM PRICE TO BE CHARGED FOR SERVICE BY GAS AND ELECTRIC LIGHT CORPORATIONS. The fixing of maximum rates of carriers and public service corporations, provided that such rates are not confiscatory and in violation of property rights, is a proper exercise of the police power of the state vested in the legislature, but this power is not so inherently or exclusively legislative that the legislature may not, in the exercise of the plenary powers and in the absence of any express limitation by the State or Federal Constitution, delegate to and confer upon other branches of the state government, by general laws, the duty not only of executing a law enacted for the purpose of regulating rates but of determining its application to particular cases and the formulating of rules for its exercise; hence, the statute (L. 1905, ch. 737) providing for the appointment by the governor of a commission authorized to determine, upon the complaint of municipal authorities or consumers, the maximum price to be charged for service by gas and electric light companies, is not such a delegation of legislative powers that it is violative of any express or implied provision of the State Constitution relating to the subject. The legislature, not the commission, enacts that there shall be maximum rates for the charges of the gas and electric light companies; that light shall be furnished to consumers at those rates, and has provided the penalty for extorting greater charges for service. What is intrusted to the commission is the duty of investigating the facts, and, after a public hearing, of ascertaining and determining, "within the limits prescribed by law," what is a reasonable maximum rate.

2. SAME — STATUTE NOT VIOLATIVE OF PROVISION OF FEDERAL CONSTITUTION GUARANTEEING TO EVERY STATE A REPUBLICAN FORM OF GOVERNMENT — HISTORY OF THE DELEGATION OF LEGISLATIVE POWERS IN THIS STATE. A contention that the blending of legislative and executive or administrative powers in the same officers might be a violation of the provision of the Federal Constitution (U. S. Const. art. 4, § 4) guaranteeing to every state a republican form of government is untenable. The constitutional guaranty does not require or imply that the three great powers of government, legislative, executive and judicial, shall be kept absolutely separate and independent of each other. While legislative powers that are strictly and exclusively legislative cannot be delegated, yet, both before and after the ratification of the Federal Constitution by the state of New York, and under all the constitutions of the

state, the legislature has imposed duties, involving the exercise of legislative, as well as administrative or judicial, powers upon administrative and judicial officers. During that time the people have had ample opportunities, in the adoption of four constitutions, or the amendment thereof, to correct any misconception or misconstruction as to their powers, on the part of public officers, whether legislative, executive or judicial, but no constitutional provision restraining the legislature from delegating legislative powers, when necessary for the execution of general laws, has been adopted, and any exercise of power by the legislature which for a long time has passed unchallenged, or, if challenged, has been sustained by the courts, must be deemed to have been approved by the people, unless forbidden by subsequent constitutional provision.

3. SAME — REQUIREMENT OF STATUTE THAT THE RATE FIXED SHALL BE "WITHIN THE LIMITS PRESCRIBED BY LAW" — ADEQUATE PROTECTION TO COMPANIES. The contention that, even conceding that the legislature may commit to an administrative board the power to determine a tariff of rates, the statute in question is invalid, because it fails to provide some standard by which the action of the board is to be governed, and that without such provision the whole plenary power of the legislature is intrusted to the board, whose action may be arbitrary, is untenable. The provision that the commission shall fix the rate " within the limits prescribed by law" is an adequate guard against arbitrary action; the provision includes both statute and common law; under the former, corporations which have franchises authorizing them to charge specific rates are protected, and under the common law the rate must be " reasonable," and any other standard, unless " a mere generality," would be challenged as arbitrary.

4. SAME — PROVISION THAT ORDER OF COMMISSION MAY BE BASED UPON REPORTS OF ITS AGENTS AND INSPECTORS, APPOINTED TO EXAMINE PROPERTY AND BOOKS OF COMPANY, IN CONNECTION WITH OTHER EVIDENCE DOES NOT RENDER STATUTE INVALID. The objection that any order made by the commission may be based, not only on the evidence and proceedings had at the public hearing provided by the statute as a prerequisite for making any order fixing maximum rates, but on the *ex parte* statement of the officers, agents and inspectors of the commission, of which a company may have no knowledge and to controvert which no opportunity is afforded, is unfounded. The statute provides, in effect, that upon a written complaint the commission shall investigate the cause of complaint and inspect the works, system, plants and books of the company; that it shall hold a public hearing after due notice to the company, at which hearing the company may be heard and represented by counsel; that at such hearing, or in any other examination or proceeding under the statute, the commission has the power to subpœna and examine witnesses under oath; that the reports of its agents or inspectors must be made before or at such hearing, so that the company may have knowledge thereof; that

no orders shall be made by the commission on its own notice, or without complaint, until after reasonable notice to the company and reasonable opportunity afforded to it to prepare and present its defense; and that all the evidence and proceedings must be verified, if required, so that the record thereof may be presented to the Appellate Division upon a review of the order of the commission; and, hence, all the proceedings of the commission are quasi-judicial in their nature.

5. Same — Statute Violative of Fourteenth Amendment of Federal Constitution Guaranteeing "Equal Protection of the Laws," Because It Does Not Afford Companies Right to Petition for New Rate at End of Term of Three Years. While the provisions of the statute that "the price fixed by the commission shall be the maximum price to be charged * * * for gas or electricity * * * for a term of three years," is reasonable and valid, the further provision that the rate so fixed is to continue not only for three years but indefinitely thereafter until fixed anew on complaint made, as provided by the statute, is inequitable and violative of the provision of the fourteenth amendment of the Federal Constitution that "No state shall deny to any person within its jurisdiction the equal protection of the laws." To be valid the statute must confer equal rights on both parties, the consumers and the companies. But by the terms of the statute the only persons authorized to make complaint are certain municipal officers, or a designated number of consumers of gas or electricity. No opportunity or right is given to the corporation to apply, at the end of three years or at any time thereafter, for a new adjustment of the rates. That right is limited solely to the municipal officers or consumers, so that the statute, on its face, deprives one party of the right accorded to the other.

*Matter of Vil. of Saratoga Springs* v. *Saratoga Gas, etc., Co.*, 122 App. Div. 203, reversed.

(Argued January 20, 1908; decided February 18, 1908.)

Appeal from an order of the Appellate Division of the Supreme Court in the third judicial department, entered December 2, 1907, which affirmed a determination of the state commission of gas and electricity fixing the maximum price that the defendant could charge for gas and electricity in the village of Saratoga Springs.

The facts, so far as material, are stated in the opinion.

*Edgar T. Brackett, John B. Stanchfield, Charles H. Tuttle, James M. Beck, John A. Garver* and *Charles F. Mathewson* for appellant. Chapter 737 of the Laws of 1905, under which the proceeding was taken, is unconstitutional on the ground

that it denies the company, whose property is taken by order of the commission, the equal protection of the laws. (*L. S. & M. S. R. R. Co.* v. *Smith,* 173 U. S. 684; *U. S.* v. *Cruikshank,* 92 U. S. 542; *Ex parte Virginia,* 100 U. S. 339; *C., etc., Ry. Co.* v. *Minnesota,* 134 U. S. 418; *Matter of Ah Fong,* 3 Sawyer, 244; *Tenement House Comm.* v. *Moeschen,* 179 N. Y. 325; *Stuart* v. *Palmer,* 74 N. Y. 183; *Gilman* v. *Tucker,* 128 N. Y. 190; *Coxe* v. *State,* 144 N. Y. 396; *Colon* v. *Lisk,* 153 N. Y. 188.) The delegation of legislative power to a non-elective body, not a local sub-agency of government and not mentioned in the Constitution as capable of receiving such delegation, is unconstitutional and void. (*People ex rel. Broderick* v. *Morton,* 156 N. Y. 136; *Matter of Davies,* 168 N. Y. 89; *People ex rel. Burby* v. *Howland,* 155 N. Y. 270; *People ex rel. McDonald* v. *Keeler,* 99 N. Y. 463; *Wynehamer* v. *People,* 13 N. Y. 378, 391; *Kilbourn* v. *Thompson,* 103 U. S. 168; *Barto* v. *Himrod,* 8 N. Y. 483; *People* v. *Acton,* 48 Barb. 524; *J. C. Assn.* v. *Parker,* 28 Misc. Rep. 280; *People ex rel. Devery* v. *Coler,* 173 N. Y. 103.) The practical effect and underlying purpose of chapter 737 of the Laws of 1905 were to transfer to a non-elective body of three, not a local agency of government and not mentioned in the Constitution, substantially all the police powers of the state and all the legislative discretion and functions of the legislature, with respect to the control, management and restriction of the business of supplying gas and electricity, whether conducted by individuals or corporations. Hence the act is unconstitutional as a whole. (*Pollock* v. *F. L. Co.,* 158 U. S. 601; *People* v. *O. C. R. C. Co.,* 175 N. Y. 84; *R. R. Co.* v. *Conine,* 1 Ohio St. 77; *Field* v. *Clark,* 143 U. S. 649; *State* v. *G. N. Ry. Co.,* 100 Minn. 445; *King* v. *C. F. Ins. Co.,* 140 Mich. 258; *U. S.* v. *Matthews,* 146 Fed. Rep. 306; *U. S.* v. *Blasingame,* 116 Fed. Rep. 631; *Harmon* v. *State,* 66 Ohio St. 249; *State ex rel. Rusk* v. *Budge,* 14 N. D. 532.) Chapter 737 of the Laws of 1905 is also unconstitutional because one of its integral principles is the delegation to the judiciary of

non-judicial powers as to the details of the gas and electric business and the maximum rates for the sale of gas and electricity. (*C. S. Bank* v. *Town of Greenburgh*, 173 N. Y. 215 ; *People ex rel. Decker* v. *Waters*, 4 Misc. Rep. 1; *People ex rel. Davis* v. *Truman*, 4 Misc. Rep. 247 ; *People ex rel. Deutsch* v. *Dalton*, 9 Misc. Rep. 249 ; *Matter of Attorney-General*, 21 Misc. Rep. 101 ; *Houseman* v. *Judge*, 58 Mich. 364; *Ex parte Griffiths*, 118 Ind. 83 ; *Supervisors of Elections*, 114 Mass. 247 ; *State* v. *Young*, 29 Minn. 474; *Tyson* v. *Washington Co.*, 110 N. W. Rep. 634.) The act is also unconstitutional as a whole because its design and effect are to deprive those engaged in the gas or electric business of their liberty and property without compensation or due process of law. It is not a regulation but an infringement. (*C., etc., T. Co.* v. *Sandford*, 164 U. S. 578 ; *C., M., etc., Ry. Co.* v. *Tompkins*, 176 U. S. 172 ; *M., etc., R. R. Co.* v. *Beckwith*, 129 U. S. 26 ; *R., etc., R. Co.* v. *Joel*, 41 App. Div. 43 ; *Munn* v. *Illinois*, 94 U. S. 113 ; *A. C. L. R. R. Co.* v. *N. C. C. Comm.*, 206 U. S. 1 ; *Stone* v. *F. L. & T. Co.*, 116 U. S. 307 ; *Budd* v. *New York*, 143 U. S. 517 ; *Bradley* v. *Irrigation Dist.*, 68 Fed. Rep. 948 ; *Wright* v. *Hart*, 182 N. Y. 330.) The power delegated to the commission to fix maximum rates is, in so far as it relates to the village of Saratoga Springs, a legislative and not a judicial, administrative or ministerial power. (*People* v. *Budd*, 117 N. Y. 1; *L. S., etc., Ry. Co.* v. *Smith*, 173 U. S. 684; *B. U. G. Co.* v. *City of New York*, 115 App. Div. 69; 188 N. Y. 334; *Peik* v. *R. Co.*, 94 U. S. 164; *Detroit* v. *D. S. Ry. Co.*, 184 U. S. 368 ; *Fisher* v. *N. Y. C. R. R. Co.*, 46 N. Y. 644; *C., etc., Ry. Co.* v. *Wellman*, 143 U. S. 339; *Reagan* v. *F. L. & T. Co.*, 154 U. S. 362; *C., etc., Ry. Co.* v. *Minnesota*, 134 U. S. 418; *Sinking Fund Cases*, 99 U. S. 700.) Assuming that the act does fix as a standard such charge as is "reasonable to the public and reasonable to the corporation," such a standard is not one so sufficiently defined as to make the action of the commission administrative. (*T., etc., Ry. Co.* v. *I. C. Comm.*, 162 U. S.

197 ; *I. C. Comm.* v. *Ry. Co.*, 167 U. S. 479.)  The plan as to rate-making, embodied in sections 17 and 19, is unconstitutional as involving the delegation to the judiciary of non-judicial powers.  (*W. U. T. Co.* v. *Myatt*, 98 Fed. Rep. 335 ; *S. L. & S. F. Ry. Co.* v. *Gill*, 156 U. S. 649 ; *Reagan* v. *F. L. & T. Co.*, 154 U. S. 397 ; *Steenerson* v. *G. N. Ry. Co.*, 69 Minn. 353 ; *S. D. L. Co.* v. *National City*, 174 U. S. 739 ; *S. D. L. & T. Co.* v. *Jasper*, 189 U. S. 439.) By authorizing the commission, when fixing rates or ordering improvements in methods, manufacture, transmission or supply, to proceed upon *ex parte* evidence furnished by its members, officers, agents or inspectors, section 17 deprives those engaged in the gas or electric business of their liberty and property without due process of law.  (*Bagg's Case*, 11 Coke, 99 ; *Protector* v. *Colchester*, Style, 477 ; *Wynehamer* v. *People*, 13 N. Y. 378 ; *Fisher Co.* v. *Woods*, 187 N. Y. 90 ; *People* v. *Gillson*, 109 N. Y. 389 ; *Litchfield* v. *Bond*, 186 N. Y. 66 ; *M., etc., R. R. Co.* v. *Beckwith*, 129 U. S. 26 ; *R., etc., R. Co.* v. *Joel*, 41 App. Div. 43 ; *Davidson* v. *Board*, 96 U. S. 97 ; *Stuart* v. *Palmer*, 74 N. Y. 183.)  By allowing the municipality after the lapse of three years to apply for a change in the rate, while denying a corresponding right to the supplier of gas or electricity, the act works a denial of the equal protection of the laws.  (*C., etc., T. R. Co.* v. *Sandford*, 164 U. S. 592 ; *Smyth* v. *Ames*, 169 U. S. 466 ; *G. C. & S. F. Ry. Co.* v. *Ellis*, 165 U. S. 150 ; *Durkee* v. *Janesville*, 28 Wis. 464 ; *Wilder* v. *C. & W. M. Ry. Co.*, 70 Mich. 382 ; *Colon* v. *Lisk*, 153 N. Y. 188 ; *Cotting* v. *K. C. S. Yards*, 183 U. S. 79.)

*Elon R. Brown* for the Watertown Gas Light Company, intervening.  Chapter 737 of the Laws of 1905 contravenes the purpose underlying the Constitution of this state to secure to the people of the state a representative form of government in which the powers of the executive, the legislative and the judicial branches shall be separately maintained.  (*L. S. & M. S. R. R. Co.* v. *Smith*, 173 U. S. 684.)

*Marcus T. Hun, Edward B. Whitney* and *Frank Gick* for Village of Saratoga Springs, respondent. Appellant's contention that the provision that the rate fixed shall continue in force for three years is unconstitutional, cannot be sustained. (*Purdy* v. *E. R. R. Co.*, 162 N. Y. 43; *C., etc., R. R. Co.* v. *Minnesota*, 134 U. S. 418; *People* v. *Fire Assn.*, 92 N. Y. 311.) Appellant's contention that it is denied the equal protection of the law is untenable. (*B. U. G. Co.* v. *City of New York*, 50 Misc. Rep. 450; 188 N. Y. 334.) Even were some particular provisions of the act chapter 737 of the Laws of 1905 capable of a construction so broad as to be unconstitutional such defect would not impair the validity of that part of the act providing for the fixing of a rate of charge. (*Stuart* v. *Palmer*, 74 N. Y. 183; *Cox* v. *State*, 144 N. Y. 396; *Colon* v. *Lisk*, 153 N. Y. 188; *People ex rel. Angerstein* v. *Kenney*, 96 N. Y. 294; *Duryee* v. *Mayor, etc.*, 96 N. Y. 477; *Reagan* v. *F. L. & T. Co.*, 154 U. S. 363; *Packet Co.* v. *Keokuk*, 95 U. S. 80; *Matter of Middleton*, 82 N. Y. 196; *People ex rel. Fowler* v. *Bull*, 46 N. Y. 69; *Gordon* v. *Comrs.*, 47 N. Y. 617; *People ex rel. Hayden* v. *Common Council*, 50 N. Y. 525.) The legislature has the right to delegate, where necessary, the power to fix rates. (*People* v. *Fire Assn.*, 92 N. Y. 311; *State* v. *M. & S. P. R. R. Co.*, 38 Minn. 281; *McCollough* v. *Maryland*, 4 Wheat. 316; *Gloucester Ferry* v. *Pennsylvania*, 114 U. S. 203; *U. S.* v. *Bailey*, 9 Pet. 238; *Dastervignes* v. *U. S.*, 122 Fed. Rep. 30; *People ex rel. Jackson* v. *Potter*, 47 N. Y. 375; *Mangam* v. *City of Brooklyn*, 98 N. Y. 585; *People ex rel. Ostrander* v. *Chapin*, 105 N. Y. 309; *Mayor, etc.*, v. *Sands*, 105 N. Y. 216.) There exists a definite rule of law, under which the commission must act in fixing the rates of charge for gas furnished by a utility corporation. (*Cotting* v. *K. C. S. Y. Co.*, 183 U. S. 79; *Kilmer* v. *N. Y. C. & H. R. R. R. Co.*, 100 N. Y. 395; *Root* v. *L. I. R. R. Co.*, 114 N. Y. 300; *Armour & Co.* v. *E. E. Ill. Co.*, 115 App. Div. 51; *B. U. Gas Co.* v. *City of New York*, 50 Misc. Rep. 450; *State* v. *G. N. Ry. Co.*, 111 N. W. Rep. 289; *A. & V. R. R. Co.* v. *M. R. R.*

*Comm.*, 203 U. S. 496; *M. R. R. Co.* v. *Minnesota*, 186 U. S. 257; *S. D. L. Co.* v. *National City*, 174 U. S. 739; *S. L. & S. F. Ry. Co.* v. *Gill*, 156 U. S. 649.) Appellant's contention that the Appellate Division could not accept the power conferred upon it by the act chapter 737 of the Laws of 1905 cannot be sustained. (*C. Nat. Bank* v. *Town of Greenburgh*, 173 N. Y. 215; *People* v. *Hall*, 169 N. Y. 184; *Matter of Delavan Ave.*, 167 N. Y. 256; *People* v. *L. I. R. R. Co.*, 134 N. Y. 506; *Bank of Chenango* v. *Brown*, 26 N. Y. 467; *B. & N. Y. R. R. Co.* v. *Brainard*, 9 N. Y. 100; *Butterfield* v. *Stranahan*, 192 U. S. 470; *U. B. Co.* v. *U. S.*, 204 U. S. 364; *Elwell* v. *Comstock*, 109 N. W. Rep. 698; *S. L. R. R. Co.* v. *O'Neil*, 98 S. W. Rep. 958.)

*William S. Jackson*, Attorney-General (*George P. Decker* of counsel), for the state commission of gas and electricity. The statute of 1905 was a valid act of legislation. (*People* v. *L. I. R. R. Co.*, 134 N. Y. 506; *Matter of G. E. Ry. Co.*, 70 N. Y. 361; *People* v. *Fire Assn.*, 92 N. Y. 311; *Matter of T. F. St. Ry. Co.*, 102 N. Y. 343; *Peik* v. *C. & N. W. Ry. Co.*, 94 U. S. 164; *C., M. & St. P. Ry. Co.* v. *Minnesota*, 134 U. S. 418; *Reagan* v. *F. L. & T. Co.*, 154 U. S. 362; *N. M. G. Co.* v. *City of Memphis*, 72 Fed. Rep. 952; *S. D. L. Co.* v. *National City*, 174 U. S. 739; *Stanislaus Co.* v. *San Joaquin Co.*, 192 U. S. 201; *People ex rel. Kimball* v. *B. & A. R. R. Co.*, 70 N. Y. 569.)

*William A. Sutherland* for state public service commission. The ascertainment and declaration of reasonable rates is an administrative, and not a legislative act. (*People* v. *Budd*, 117 N. Y. 1; *People ex rel. W. G. Co.* v. *Deehan*, 153 N. Y. 528.) The courts have uniformly declared the constitutionality of acts creating administrative boards to institute suitable inquiries for the ascertainment of the reasonable rate to be charged by public service corporations. (*Reagan* v. *F. L. & T. Co.*, 154 U. S. 364; *I. C. Comm.* v. *Cincinnati*, 167 U. S. 479; *S. D. L. & T. Co.* v. *National*

*City,* 174 U. S. 739; *Spring Valley* v. *Schottler,* 110 U. S. 347; *C., M. & S. P. Ry. Co.* v. *Tompkins,* 176 U. S. 167; *M. & S. L. R. R. Co.* v. *Minnesota,* 186 U. S. 257; *Stanislaus Co.* v. *S. J. & C. Co.,* 192 U. S. 201; *Butterfield* v. *Stranahan,* 192 U. S. 470; *S. A. C. Line* v. *Florida,* 203 U. S. 256; *U. B. Co.* v. *United States,* 204 U. S. 364.) The statute in question was not obnoxious to the Constitution in ¹ that the practice relating to appeals to the courts from rates made by the commission was not regulated to please the defendant. (*Reagan* v. *F. L. & T. Co.,* 154 U. S. 362.)

CULLEN, Ch. J. This appeal presents the question of the constitutionality of the statute passed by the legislature in 1905 (Chap. 737), providing for the appointment by the governor of a commission which was authorized to determine, upon the complaint of municipal authorities or consumers, the maximum price to be charged for service by gas and electric light companies. This statute confers many other powers upon the commission. This appeal, however, presents only the question of the validity of the statute in so far as it confers upon the commission the power to fix maximum rates. The provisions of the statute in this respect are easily separable from the remainder of the act, and, therefore, it is the validity of such provisions alone that we shall consider on this appeal.

The argument by the learned counsel for the appellant in their attack upon the statute has taken a very broad range. While they concede that the fixing of maximum rates of carriers and public service corporations is a proper exercise of the police power of the state, provided of course that the rates so fixed are not confiscatory and in violation of property rights, it is contended that the power is strictly legislative and that the act before us is unconstitutional in that it assumes to delegate to the commission, an administrative body, legislative powers. The argument has been carried so far as to suggest that the blending of legislative and executive or administrative powers in the same officers might be a violation

of the Federal Constitution which guarantees to every state a republican form of government. While it is a mere suggestion, it should not pass unnoticed, and a brief reference to history is sufficient to dispose of it. At the time the state of New York ratified the Federal Constitution, its inhabitants were living under a Constitution by which the court of last resort, called the Court for the Correction of Errors, was composed of 24 (afterwards 32) members of the senate (the upper house of the legislature), the chancellor and the three judges of the Supreme Court, while the appointment of every officer in the executive government of the state, including local officers, with the exception of a few named in the Constitution, was vested in the council of appointment composed of one senator from each of the four senatorial districts into which the state was divided. The council of appointment continued until 1821, when it was abolished by the new Constitution of that year, but the Court of Errors remained the court of last resort until the Constitution of 1846. It would have surprised the citizens of the state had it been suggested to them during the first half of the last century that they were not living under a republican form of government; they would not have been shocked, because no one would have taken the suggestion seriously. Indeed, Justice Story, in his work on the Constitution, referring to the distribution of the three great powers of government, legislative, executive and judicial, says: "But when we speak of the separation of the three great powers of government and maintain that that separation is indispensable to public liberty, we are to understand this maxim in a limited sense. It is not meant to affirm that they must be kept wholly and entirely separate and distinct, and have no common link of connection or dependence, the one upon the other, in the slightest degree. The true meaning is, that the *whole* power of one of these departments should not be exercised by the same hands, which possess the *whole* power of either of the other departments; and that such exercise of the *whole* power would subvert the principles of a free constitution. * * * The slightest examination of the British

constitution will at once convince us that the legislative, executive and judiciary departments are by no means totally distinct and separate from each other." (See, also, opinion of HARLAN, J., in *Dreyer* v. *Illinois*, 187 U. S. 71.) It is not necessary to pursue the matter further because of the recent decisions of the Supreme Court of the United States on rate commission statutes, which, while as properly urged by counsel for the appellant they do not pass upon the question of conflict between such statutes and the Constitutions of the states in which they were enacted, do necessarily determine that the enactment of such statutes does not violate the Federal Constitution. (*Stone* v. *Farmers' Loan & Trust Co.*, 116 U. S. 307; *Reagan* v. *Same*, 154 id. 362; *Minneapolis & St. Louis R. R. Co.* v. *Minnesota*, 186 id. 257; *Atlantic Coast Line* v. *Florida*, 203 id. 256; *Atlantic Coast Line* v. *N. C. Corp. Commission*, 206 id. 1.) In the last case cited Mr. Justice WHITE said: "The elementary proposition that railroads, from the public nature of the business by them carried on and the interest which the public have in their operation, are subject, as to their state business, to state regulation which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfully questioned in view of the long line of authorities sustaining that doctrine." Therefore, the only question before us is whether the statute is in conflict with the Constitution of the state.

The argument against the constitutionality of the underlying feature of the statute proceeds on two propositions — one that legislative power cannot be delegated, and the other that rate-making is a legislative power. Each proposition is true if not construed too broadly, but both are liable to such misconstruction. To be strictly accurate, the first requires the qualification pointed out by Chief Justice MARSHALL in *Wayman* v. *Southard* (10 Wheat. 1, 42): "It will not be contended that Congress can delegate to the courts, or to any other tribunals, powers which are *strictly and exclusively* legislative. But Congress may certainly delegate to others

powers which the legislature may rightfully exercise itself."
If by the second proposition it is intended to assert that the
rate-making power being part of the police power is vested
in the legislature, it is true.    But if it is intended to go
further and deny the power of the legislature to confer by
general laws upon other branches of the government, the duty
not only of executing the law, but of determining its applica-
tion to particular cases and formulating rules for its exer-
cise, then in my judgment it is not true.    A *priori* rea-
soning as to the nature and proper distribution of the powers
of government is not conclusive on the question of what
powers are so inherently legislative as to preclude their dele-
gation in any degree to the other branches of the government.
It is now one hundred and thirty years since the people of
this state adopted their first Constitution.    Since that time
there have been four constitutional conventions, framing new
Constitutions, whose work, in whole or part, has been adopted
by the people, besides which some extensive amendments have
been enacted in the method provided by the Constitution.
The people have had ample opportunities to correct any mis-
conception or misconstruction on the part of public officers,
as to their powers, whether legislative, executive or judicial,
and any exercise of power by the legislature, which for a long
time has passed unchallenged or, if challenged, has been sus-
tained by the courts, must be deemed to have been approved
by the people, unless forbidden by subsequent constitutional
provision.    There also should be borne in mind that with us
the doctrine has always prevailed that the legislative power is
plenary, except as limited by the Federal and State Constitu-
tions (*Bank of Chenango* v. *Brown,* 26 N. Y. 467; *People ex
rel. McLean* v. *Flagg,* 46 N. Y. 401; *Lawton* v. *Steele,* 119
N. Y. 226), and that there has never been in this state that sharp
line of demarkation between the functions of the three branches
of government which obtains in some other jurisdictions.    Let
us see what the legislature has done.    When this country was
settled the power to grant an absolute divorce was in England
vested in Parliament alone.    Following that example the

colonial assemblies exercised the same power, though in some colonies provision was made for divorce by judicial decree. The validity of a legislative divorce was upheld by the Supreme Court of the United States in *Maynard* v. *Hill* (125 U. S. 190), where the divorce was enacted by the legislature of the territory of Oregon under a grant from Congress of general legislative power.   In this state and during colonial times the power remained purely legislative until, in the year 1787, a statute was passed by the legislature, which, after reciting that it was more advisable for the legislature to make general provision for such cases than to afford relief to individuals without a proper trial, conferred jurisdiction upon the Court of Chancery to decree divorces for adultery. (*Griffin* v. *Griffin*, 47 N. Y. 134; *Erkenbrach* v. *Erkenbrach*, 96 N. Y. 456.)   This transfer of power to the judiciary rested solely ón legislative enactment until the Constitution of 1846 provided that thereafter no divorces should be granted except by judicial decree.   No student of government would assert that the laying out and construction of roads is properly a judicial function.   Yet from the earliest times in the history of the state that duty, to no small extent, has been conferred upon the courts.   In *Citizens' Savings Bank* v. *Town of Greenburgh* (173 N. Y. 215) there was challenged the validity of a statute which provided for laying out and constructing highways extending through two or more towns on the presentation of a petition by a freeholder to the Supreme Court, which, after a hearing, was to determine whether the highway was necessary for the public welfare and convenience. It was urged that the act conferred non-judicial duties upon the courts.   The statute was upheld, Judge Gray saying: " The legislature is unrestricted in its power to provide for the construction of public highways, and, from an early date in this state, there has been legislation devolving functions similar in effect to those imposed in this act, which has never been held to be objectionable by this court."  Judge Gray quoted from the opinion in *Commissioners of Highways of Warwick* v. *Judges of Orange County* (13 Wend. 433), where

Judge NELSON said: "The proceeding by appeal was not intended to be a review of legal questions, or of irregularities that might exist in the preliminary steps, as on a writ of certiorari; but to be an examination of the necessity or propriety of the road, assuming all the previous steps to have been regularly taken." In 1797 (Chap. 64) the legislature conferred upon the Courts of Common Pleas of the various counties power to grant licenses for the keeping of ferries and to prescribe the tolls to be charged. This power continues to this day, being now vested in County Courts and City Courts (Highway Law, §§ 170, 171), and a member of this court, when county judge of Erie county, granted such a license and fixed the rates of ferriage.

We find at a very early date a similar transfer of legislative power to an administrative board. In England corporate charters were conferred by the Crown or by the Crown and Parliament. That power in this country was never vested in the executive, but in the legislature. (Morawetz on Private Corporations, § 8.) The regents of the university of this state were incorporated by an act of the legisture in the year 1784. In 1787 (Chap. 82) the legislature conferred on that body the power to incorporate colleges and academies, and this power it still possesses, though the existence of such a body as the regents of the university was never recognized in the fundamental law till the Constitution of 1894. Examples of early practice in the state might be multiplied, but those given are sufficient to indicate the general trend of legislative action and the recognition of the validity of such action.

The various modifications that have been made in the Constitution of the state, instead of limiting the power of the legislature to confer on the other branches of the government minor and subordinate functions, which the legislature might discharge itself, have tended to increase the necessity for such delegation of power, if it may properly be termed such. The Constitution of 1846 directed the legislature in some cases to pass general laws as far as practicable and

deprecated special acts. The constitutional amendments of 1875 went further and prohibited the legislature from passing special or local acts in no less than fourteen specified cases, and required that in relation thereto only general statutes should be enacted. The effect of limiting the legislature to general statutes necessarily required that body to confer upon agencies of the government much discretion as to the application of the statutes to individual cases. The legislature was forbidden to pass a special or local act granting to any corporation, association or individual the right to lay down railroad tracks. The result was that the legislature, of necessity, was compelled either to grant the unlimited privilege to all persons possessing the requisite capital to incorporate under a general act and construct railroads at their pleasure, regardless of public advantage or necessity, or, on the other hand, to confer on some other branch of the government the determination of the question of public advantage. In this situation it created the board of railroad commissioners and conferred upon that board the duty of ascertaining the facts, and deciding whether the proposed road should be built, and provided for an appeal from that decision to the Appellate Division of the Supreme Court. It thus gave the subject a dual aspect, administrative and judicial, for it has been held by this court that though the board is an administrative body its acts are judicial and are the subject of review on certiorari. (*People ex rel. Steward* v. *Railroad Comrs.*, 160 N. Y. 202.) In *People* v. *Long Island Railroad Co.* (134 N. Y. 506) a statute empowering the Supreme Court or County Court, on application of the local authorities and notice to the railroad company, to order that gates be erected at the intersection of the railroad and a street, was challenged as conferring legislative powers on the court. Its validity was upheld. In *Matter of Gilbert Elev. Ry. Co.* (70 N. Y. 361) the attack was made on the Rapid Transit Law that it delegated legislative power to the commissioners in authorizing them to designate the streets on which the road was to be built, to determine the form of the structure and to make rules and regulations for running the trains. Chief Judge Church there

said : " The legislature had the power to determine all these questions itself, but I am not aware of any rule which forbids the legislature from referring such questions to a subordinate tribunal.    There is no prohibition in the Constitution itself, express or implied, while the practice of the government has been uniformly in favor of referring analogous questions." (See, also, *Matter of N. Y. Elevated R. R. Co.*, 70 N. Y. 327.)  I have not referred to the practice of committing to municipal organizations of the state local legislative power, as that is admitted by all to be an exception to the general rule that legislative power cannot be delegated, because it is in conformity with the general principle which prevails with us of fostering local self-government.  (Cooley's Const. Limitations, 118 ; *Clarke* v. *City of Rochester*, 28 N. Y. 605.)  There is this much, however, to be said of that practice.  Powers which are claimed to be legislative are often conferred, not on the legislative branch of the municipality, but on its administrative officers.  This is markedly so as to the broad powers conferred on local boards of health.  Another notable instance is the statute which confers upon examining boards appointed by the mayors in certain cities in the state the power to examine, as to their qualifications and fitness, all persons intending to engage in the business of plumbing, and enacts that no one shall practice such business without a license from said board.  This statute was upheld (*People ex rel. Nechamcus* v. *Warden of City Prison*, 144 N. Y. 529). I cannot see why, on principle, powers that can be delegated to the administrative officers of a municipality for exercise within the municipality are not equally the subject of delegation to state administrative officers for exercise throughout the state. This review of the course of legislation and of the judicial authorities in this state, I think, clearly shows that while powers inherently and exclusively legislative cannot be delegated, there is a large field in which the legislature, to quote Chief Justice MARSHALL'S words, " may certainly delegate to others powers which the legislature may rightfully exercise itself."

The decisions of the Supreme Court of the United States show that there is a similar domain in the Federal government, although the later opinions express the doctrine in rather different terms from those used by Chief Justice Marshall. In *Miller* v. *Mayor* (109 U. S. 385) the suit was to prevent the construction of the Brooklyn bridge across the East river. An act of Congress authorized the construction of the bridge provided it should be so constructed as not to obstruct or impair the navigation of the river, and to secure compliance with these conditions it required the company, previous to commencing construction, to submit to the secretary of war the plans of the proposed bridge. Upon the secretary of war being satisfied that the bridge conformed to the requirements prescribed by Congress he was directed to notify the company to that effect, and thereupon the company was authorized to build the bridge in conformity with such plans. It was alleged that the bridge did, in reality, obstruct navigation, and it was contended to be beyond the power of Congress to confer upon the secretary of war the right to determine whether its requirements had been complied with so as to preclude the courts from examining and deciding that fact. The suit failed. In the opinion it is said : " It is argued that Congress could not give any such effect to the action of the secretary, it being judicial in its character. There is in this position a misapprehension of the purport of the act. By submitting the matter to the secretary, Congress did not abdicate any of its authority to determine what should or should not be deemed to be an obstruction to the navigation of the river. It simply declared that, upon a certain fact being established, the bridge should be deemed a lawful structure, and employed the secretary of war as an agent to ascertain that fact." A similar proposition was declared in *Union Bridge Co.* v. *United States* (204 U. S. 364), which was also a case of the obstruction of navigable waters. In *Field* v. *Clark* (143 U. S. 649) it was held that an act of Congress making it the duty of the president to suspend certain provisions of the act on being satisfied

that any foreign country, exporting certain specified articles, imposed duties on the products of the United States which he should deem reciprocally unequal and unreasonable, was not a delegation of legislative power. It was there said by Justice HARLAN the act "does not, in any *real sense,* invest the President with the power of legislation * * * nothing involving the expediency or the just operation of such legislation was left to the determination of the President." In the opinion there is to be found an extensive review of similar legislation enacted by Congress. In *Buttfield* v. *Stranahan* (192 U. S. 470) an act of Congress prohibited the importation of tea inferior in purity, quality and fitness for consumption to the standards provided for by the act. The act provided that those standards should be established by the secretary of the treasury on the recommendation of a board of experts which he was authorized to appoint. This was held not to invest administrative officers with the powers of legislation. It was there said : " Congress legislated on the subject as far as it was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute. *To deny the power of Congress to delegate such a duty would, in effect, amount but to declaring that the plenary power vested in Congress to regulate foreign commerce could not be efficaciously exerted."* Yet it cannot be gainsaid that in all these cases Congress might have exercised itself the functions which it imposed on administrative officials. The pith of these decisions is to be found in the concluding sentence of the opinion of Mr. Justice WHITE in the case last cited.

We are now brought to the consideration whether, not the power to enact general laws for the regulation of rates, but, the power to prescribe the particular rates to be charged by particular carriers, public service corporations or other persons engaged in occupations or business affected with the public interest, and so constitutionally subject to regulation as to their charges, is so inherently and exclusively a legisla-

tive power that it is impossible of delegation to other branches of the government.   There is first presented to us the argument resting on history, and it is said : "It cannot be gainsaid that until very recently the duty (that of imposing rates) was at all times a legislative one.   For many centuries Parliament has directly legislated as to the price of products, regulating the selling value of the great staples like wool and food and even the employment of labor.   *   *   *   The earliest known regulation of rates of carriage was by an act of Parliament in 1692."   If by this it is intended to assert that specific rates for commodities, services or labor were prescribed by Parliament alone, my research (which is necessarily limited) leads me to the belief that the statement is incorrect. Legislation fixing the wages of laborers commenced at a very early period in England and it may be that at that time the act of Parliament in terms fixed the special wage.   The matter was the subject of different and, possibly, conflicting legislation until the time of Elizabeth, when many of the old laws were repealed and a comprehensive statute enacted embracing servants, laborers, artificers and substantially all of what we would term the wage earning class.   (Cap. 4, 5 Eliz. 1562.)  The statute (§ 15) made it the duty of the justices of the peace in every shire to meet with the sheriff of the county, if it was convenient, and with the mayor of any city or incorporated town, if there was such in the shire, after Easter in each year, and limit, rate and appoint the wages for all artificers, handicraftsmen, husbandmen or other laborer, servant or workman.   As far as I can discover from the time of the enactment of this statute until the regulation of wages ceased to be regarded as a proper subject for state control, wages were fixed, not by act of Parliament, but by the justices of the peace.   This must have been the most extensive, if not also the most important field of rate making upon which the government ever entered.   The power thus devolved upon the justices of the peace was not conferred on any principle of local self government which obtains with us, for no such idea prevailed in England, except possibly in the cases

of chartered cities or towns to which special privileges were granted by their charters. The justices of the peace were appointed and removed by the Crown at pleasure, and, like our own, were more administrative than judicial in their functions. (*People ex rel. Lawrence* v. *Mann,* 97 N. Y. 530.) The power was conferred on the justices simply for convenience, or, possibly, of necessity, because at the time of the enactment of the statute the condition of the country, almost devoid of proper highways for the transportation of goods, and with comparatively little communication between the inhabitants of its different parts, must have occasioned great difference in the price of commodities and rates of wages in different localities. The only act I find passed in 1692 on the subject of carriers is 3rd W. & M. (Cap. 12). By section 24 it is enacted " That the Justices of the Peace of every County, and other Place within the Realm of England, or Dominion of Wales shall have Power and Authority, and are hereby injoined and required, at their next respective Quarter or General Session after Easter Day, yearly, to assess and rate the Prices of all Land-carriage of Goods whatsoever, to be brought into any Place, or Places within their respective Limits and Jurisdictions, by any common Waggoner or Carrier." Here again the power to fix rates was conferred on administrative officers. These statutes must have remained extant till the close of the eighteenth century, for in an edition of Burns' Justice, published in 1800, much space is devoted to the duty of the justices under them, and an edition of Bacon's Abridgment, published in 1807, mentions them as then in force. Indeed, Sir James Stephen states that the act of Elizabeth was not formally repealed until 1875, though it practically became a dead letter many years before. Legislation in England prior to the revolution would, therefore, seem rather to support than to disprove the proposition that details of rate making can properly be delegated to administrative officers.

We see no reason why such power should be denied to the legislature. It is, doubtless, true, as said by Justice BREWER, in *Interstate Commerce Commission* v. *Railway Co.* (167

U. S. 479), that " The power to prescribe a tariff of rates for carriage by a common carrier is a legislative and not an administrative or judicial function, and, having respect to the large amount of property invested in railroads, the various companies engaged therein, the thousands of miles of road, and the millions of tons of freight carried, the varying and diverse conditions attaching to such carriage is a power of supreme delicacy and importance." I do not understand, however, that by this single sentence excerpted from his opinion that eminent judge intended to deny the power of Congress to commit the establishment of a tariff of rates to an administrative body. On the contrary, after referring to the belief that great abuses existed in railroad management and transportation and to the grave question before Congress as to how those abuses were to be corrected, he said : " There were three obvious and dissimilar courses open for consideration. Congress might itself prescribe the rates ; *or it might commit to some subordinate tribunal this duty ;* or it might leave with the companies the right to fix rates, subject to regulations and restrictions, as well as to that rule which is as old as the existence of common carriers, to wit, that rates must be reasonable." In that case the question was whether Congress had conferred upon the commission the power to establish a tariff of rates, not whether Congress could confer that power, a proposition which I understand the opinion in the part quoted to affirmatively assert. The enormous pecuniary interest involved and the inherent difficulties of the problem would doubtless dictate great caution and mature deliberation in enacting any legislation on the subject, but it seems to me that they should equally dictate that the legislation enacted should provide the most practical, just and efficient solution of the problem. These considerations also apply to the case before us. There are in this state approximately four hundred and fifty gas light and electric light companies. They are located in nearly every portion of the state, which contains within its bounds not only cities varying in population from ten thousand to four millions, but villages, agricultural or rural communities, and the wild forests of

the Adirondacks.   It is plain that no uniform rate of charges could be established that would be just or reasonable. Besides, the difference in the output of the several companies, varying with the size of the communities they respectively supply, as well as the difference in the cost of material to the various companies, dependent on their location with reference to the cost of transportation of coal, oil and the like, would make a rate that was fair in one place unreasonable in another. Therefore, any close approximation  to a reasonable tariff would require special rates to be prescribed for many different localities.   To do this properly would involve an investigation into the particular facts in each case.   There was a time in the history of this country when carriers and public service corporations were so few that the legislature itself might have performed that labor.   But by reason of the rapid growth of population and the great increase in the number of such corporations it has become impracticable for the legislature to discharge that duty.   Moreover, many rates may require alteration from time to time.   That the most appropriate method (speaking from a practical, not necessarily constitutional point of view) is the creation of a commission or body of experts to determine particular rates has been said several times in the opinions rendered by the Supreme Court of the  United States in the various railroad commission cases and in those of state courts.   Of course, these remarks were obiter, and they are cited only to show the very general recognition by the courts that convenience, if not necessity, requires such a course.   While no consideration of convenience or of supposed necessity would justify us in ignoring any constitutional mandate or limitation, it must be remembered that we have no express constitutional provision on the subject, and that it is sought to condemn the legislation before us solely by extending the principle that the legislature cannot delegate legislative powers (a principle which, though unquestionably true, is, as we have seen, true only within limits) to a point that would render efficient legislation on the subject impracticable.   It cannot be said, to use the

language of Justice HARLAN, that in any real sense the legislature has delegated its power to the commission. The statute is complete. The legislature, not the commission, has enacted that there shall be maximum rates for the charges of the gas and electric light companies, that light shall be furnished to consumers at those rates, and has provided the penalty for extorting greater charges for service. What is intrusted to the commission is the duty of investigating the facts, and, after a public hearing, of ascertaining and determining what is a reasonable maximum rate. I cannot see how the duty intrusted to the commission in this case differs in principle from that imposed on the president to determine that duties were reciprocally unequal or on the secretary of the treasury to determine what was inferior tea.

It is said by Mr. Justice BREWER in *Chicago, etc., Ry. Co. v. Dey* (35 Fed. Rep. 866): " While, in a general sense, following the language of the Supreme Court, it must be conceded that the power to fix rates is legislative, yet the line of demarkation between legislative and administrative functions is not always easily discerned. The one runs into the other. The law books are full of statutes unquestionably valid, in which the legislature has been content to simply establish rules and principles, leaving execution and details to other officers." This is necessarily so, for, except to the limited extent the subject is dealt with in the fundamental law, the powers and duties of the administrative branch of government proceed from legislative enactment. The legislature may create a commission to construct a capitol and leave to it unfettered discretion as to the character and design of the building. On the other hand, the legislature may prescribe the minutest details of the plan and specifications. As is well stated in the able prevailing opinion in the court below, the real question in the case is not whether making a tariff of rates is legislative, but whether it is so exclusively legislative that it cannot be conferred on any other tribunal. Neither on principle nor, in this state at least, on precedent or authority can the proposition be maintained,

The learned counsel for the appellant has cited a number of decisions in other states, not on the precise point now before us, but on the subject of what constitutes delegation of legislative power. It is argued that these decisions logically lead to the condemnation of a statute empowering a commission to fix rates. We shall not attempt to review the particular cases, but confine ourselves to saying that many, if not the majority, of the decisions are, as to the points therein decided in conflict with the decisions of this state. Moreover, it is to be observed that whether logically or not they lead to the conclusion that power to fix rates cannot be conferred upon a commission, no such conclusion has been reached by the court of last resort in any state, while on the other hand there are several decisions sustaining such legislation. (*People* v. *Harper*, 91 Ill. 357; *Chicago, B. & Q. R. R. Co.* v. *Jones*, 149 Ill. 361; *State ex rel. R. & W. Comm.* v. *C., M. & S. P. Ry. Co.*, 38 Minn. 281; *State ex rel. Bd. of Transportation* v. *Fremont, etc., R. R. Co.*, 22 Neb. 313; *Georgia Railroad* v. *Smith*, 70 Ga. 694; *McWhorter* v. *Pensacola, etc., R. R. Co.*, 24 Fla. 417; *Stone* v. *Y. & M. V. R. R. Co.*, 62 Miss. 607; *Atlantic Express Co.* v. *Wilmington, etc., R. R. Co.*, 111 N. C. 463.)

It is now necessary to consider the objections to some special features of the particular act before us. It is contended that conceding that the legislature may cómmit to an administrative board the power to determine a tariff of rates, the statute must prescribe some standard by which the action of the board is to be governed; that otherwise the whole plenary power of the legislature is intrusted to the board, whose action may be arbitrary, and it is urged that the statute before us provides no such standard. We think otherwise. The statute provides that the commission shall fix the rates within the limits prescribed by law. This includes both statute law and common law. There may have been companies which had franchises immune from invasion by which they were authorized to charge specific rates. The common law prescribes the rule that the rate shall be reasonable and, I think, even without special mention

the statute would necessarily imply the same limitation. But it is said that granting this, "reasonable" is really no standard but a mere generality. Again, we are of a different opinion. Indeed, if the statute assumed to fix any other standard for rates than that they should be reasonable, we think it would be much more open to attack than in its present form. A lawmaker might exhaust reflection and ingenuity in the attempt to state all the elements which affect the reasonableness of a rate only to find that in a particular case he had omitted the factor which controlled the disposition of that case. A very good instance of such danger is to be found in *Matter of Janvrin* (174 Mass. 514). In that case, which involved the rates of a water company, the legislature had prescribed that the rate was to be "a reasonable sum" measured by the price ordinarily charged for a similar service in the other cities and towns within the metropolitan district. This provision was assailed on the claim that it allowed one company to fix the price for another company. The court successfully disposed of the objection by a somewhat liberal construction of the statute, but the case illustrates the wisdom of the legislature in prescribing as the sole standard of maximum rates that they shall be reasonable. Any other standard, unless also "a mere generality," would surely be challenged as arbitrary.

It is also objected that any order made by the commission may be based not only on the evidence and proceedings had at the public hearing provided by the statute as a prerequisite for making any order fixing maximum rates, but on the *ex parte* statement of the officers, agents and inspectors of the commission, of which a company may have no knowledge, and to controvert which no opportunity is afforded. We do not so construe the statute. Section 15 provides that on written complaint being made as to the illuminating power, purity, pressure or price of gas or electricity sold by any company, the commission shall investigate the cause of complaint, and may by its agents and inspectors inspect the works, system, plants and books of the company. Section 16 pro-

vides for the form of written complaint.  Section 17 provides for a public hearing and that notice of the complaint shall be served on the corporation affected thereby, that both the complainants and the corporation shall have an opportunity to be heard and to be represented by counsel.  By subdivision 10 of section 9 the commission is given power to subpœna witnesses, take testimony and administer oaths in any proceeding or examination instituted before it or conducted by it under the provisions of the act.  As we read the statute, the investigation and report of agents and inspectors are to follow the filing of any complaint and to precede or to be made during the public hearing.  This is made clear by section 18, which provides that orders made by the commission on its own notice or without complaint shall be made only after reasonable notice to the corporation and reasonable opportunity to such corporation to prepare its defense or objection to the demands of the commission.  It is plain that no corporation could make its defense until it was clearly notified of what was charged against it and the proof to support such charge was given.  While the commission might not be bound by technical rules of evidence, still it was plainly intended that the whole proceeding should assume a quasi-judicial aspect.  This is necessarily so, for the Appellate Division is empowered to review the order of the commission, a review which requires something in the shape of a record of the proceedings of the commission.  The commission being empowered to subpœna witnesses and take testimony, its inspectors or agents could be required to appear and verify any reports made by them, or if we assume that such reports could be received in the first instance without verification, the inspectors or agents could be compelled to attend at the instance of either party and be examined as to the truth of the statements in their reports and their knowledge of the facts therein contained.  The objection that the act confers non-judicial functions upon the Appellate Division is sufficiently answered by the decision of this court in *People ex rel. Steward* v. *Railroad Commissioners (supra)*.

We now reach, however, a provision of the statute which, in our judgment, necessarily renders it invalid. The statute enacts that "the price so fixed by the commission shall be the maximum price to be charged by such person or corporation for gas or electricity in such municipality for a term of three years, and until, after the expiration of such term, such commission shall, upon complaint as provided in this section, again fix the price of such gas or electricity." We have no difficulty in upholding the provision that the rate shall remain as established for the term of three years. It is urged that circumstances might so alter that before the expiration of three years a rate which was reasonable at the time it was established would become unreasonable. This is possible, nevertheless, we think the legislature was justified in enacting some period of repose during which the rate should remain stable. In answer to this objection we cannot do better than quote the reply made by Chief Justice Holmes to a similar objection in the Massachusetts case cited (*Matter of Janvrin*). He said: "But supposing a party aggrieved should obtain an injunction, obviously the decree would be drawn so as to bind the defendant for a reasonable time, or if it were drawn in the common form, subject to review on a change of circumstances, the court would not be likely to grant leave to file a bill of review until a reasonable time had elapsed, and if the legislature should say that in these cases five years was a reasonable time, we could not say that it was wrong." The real difficulty with this provision of the statute is that the rate fixed by the commission is to continue not only for three years but indefinitely thereafter until fixed anew on complaint as provided by the statute. But by the terms of the statute the only persons authorized to make complaint are certain municipal officers or one hundred or more customers or purchasers of gas or electricity. No opportunity or right is given to the corporation to apply, at the end of three years or at any time thereafter, for a new adjustment of the rates. That right is limited solely to the municipal officials or consumers. This is the construction of the statute accepted both by the

courts below and by the learned counsel for the respondents. Nor do we see any possibility of giving any other construction to the words of the statute. It seems to us that this is a real case violating the inhibition of the fourteenth amendment to the Federal Constitution : "No state shall deny to any person within its jurisdiction the equal protection of the laws." That the statute on its face deprives one party of the right accorded to the other party is conceded ; but it is attempted to justify that inequality on three theories. The learned court below said that the company would be in no worse condition than if the legislature had itself fixed rates, for in such case the rates would be permanent until the statute enacting them had been modified or repealed. This is doubtless true; but statutory rates would operate equally on both parties. It would be just as necessary for the consumer, in order to obtain lower rates, to apply to the legislature for a change of the statute as it would be for the corporation to take a similar course for an increase of rates. Neither party would have any advantage over the other. Next it is said that in case the rates became unfair the corporation could apply to the legislature for relief and for a repeal of the statute. This is also true, but it is not an answer to the unconstitutionality of a statute that the legislature might repeal it. By the enactment of this statute the legislature intended to establish permanently a tribunal for the adjustment and determination of conflicting claims of consumers and corporations as to what were reasonable rates to be charged, and the validity of the statute must be decided, not on the possibility or probability of its repeal, in which it differs in no degree from other statutes, but on the statute itself. Finally the respondents take the position that if the rate is confiscatory the corporations may contest its validity in the courts. This we may assume to be true ; nevertheless the order of the commission is at least presumptively valid and *prima facie* evidence that the rate prescribed is reasonable. Such an order would throw on the corporations the burden of proving its invalidity. Moreover, we are by

no means certain that there is not a difference between a rate that is confiscatory and one that is reasonable. The courts could scarcely declare a rate confiscatory which yielded a return equal to that generally obtained from the investment of capital. On the other hand, the circumstances of a particular case might render it fair to award the corporation a return greater than that resulting from ordinary investments. One can hardly be expected to invest capital in an enterprise involving risk for the same return that he could receive from an investment in safe securities. It is not necessary to say that these and similar matters should be taken into consideration; it is sufficient to say that the commission might consider them. What we do hold is that a statute of the character of the one before us to be valid must confer equal rights on both parties, the consumers and the companies. It was said on the argument that the omission in the statute to give the companies an equal right with the consumers occurred through inadvertence. If so the inadvertence is to be regretted, for it constrains us to declare invalid the portion of the statute before us which we would otherwise uphold. It, however, is an objection that can be readily remedied by legislation giving all parties in interest an equal right to appeal to the commission for a readjustment of rates.

The order of the Appellate Division should be reversed and the order of the commission vacated and set aside, with costs in both courts.

Gray, Haight, Vann, Werner, Willard Bartlett and Hiscock, JJ., concur.

Order reversed, etc.