In the Matter of the Application of MORRIS BERGER and Another for a Peremptory Order of Mandamus against JAMES C. QUINN and Others.

Supreme Court, Albany County, November 15, 1933.

*Archibald Palmer*, for the petitioners.

*Nelson Ruttenberg*, for the New York City Alcoholic Beverage Control Board and the State Alcoholic Beverage Control Board.

SCHENCK, J. This is an application for a peremptory order of mandamus directed to the New York city alcoholic beverage control board and the State Alcoholic Beverage Control Board to compel them to issue a license to the petitioners to sell beer at retail and to disregard section 75, subdivision 5, and section 76, subdivision 3, of the Alcoholic Beverage Control Law.

The petitioners conduct a retail luncheonette, food, beverage and soda business at No. 307 Seventh avenue in the city of New York.

On July 10, 1933, these petitioners were notified by the State Alcoholic Beverage Control Board that after a hearing before that Board and after a hearing before the New York city alcoholic beverage control board, their application for a license to sell beer and wine at retail had been disapproved. It is the claim of petitioners here that the Alcoholic Beverage Control Law (Cons. Laws, chap. 3-b, Laws of 1933, chap. 180) is unconstitutional in that, among other things, it unreasonably limits petitioners' rights guaranteed to them by virtue of the Fourteenth Amendment to the Federal Constitution.

These petitioners do not seek to review the action of the Board, nor do they set forth in their petition any facts which would tend to show that error had been committed by such Board. It is their claim, however, that the Alcoholic Beverage Control Law prevents them from following a useful and lawful vocation and deprives them of liberty without due process of law, and is unconstitutional.

The purpose of the law is stated in a declaration of policy contained in section 70 thereof, which reads as follows:

" § 70. Declaration of policy relative to number of licenses. The following restrictions upon, and regulations of, the brewing and sale of beer are hereby established for the reason that the manufacture or sale of beverages having any alcoholic content whatever is or may be conducive to the manufacture or sale of unauthorized alcoholic beverages; and, therefore, the provisions of this chapter are enacted as a safeguard to temperance and in order

to promote obedience to law and more effectively to prevent the unlawful manufacture and sale of beverages now prohibited by federal law. It is hereby declared to be the public policy of the state that the number of licenses in this state to traffic in beer should be restricted and the state board empowered to determine whether public convenience and advantage will be promoted by issuing such licenses, by increasing or decreasing the number thereof; and that in order further to carry out the policy hereinbefore declared, the number of licenses shall be restricted. For such purposes, the state board is hereby given discretion to determine the number of licenses, the location thereof and the persons to whom they shall be issued, subject to the right of judicial review hereinafter provided."

There can be little doubt as to the soundness of the declaration of policy as contained in section 70. Prior to the World War the saloon was conducted in a manner that tended to foster intemperance, with its attending evils. When this country entered the war, disciplining of the civilian as well as the military population became essential. When the food supply became limited there was little difficulty in securing the co-operation of patriotic citizens in reducing the manufacture of malt and spirituous liquors in order to conserve food stuffs, and under the influence of the war prohition was written into the Constitution with apparently little resistance on the part of our people generally.

The attempt to enforce prohibition, the advent of the bootlegger and racketeer, the speakeasy problem and the events following the depression which began in 1929 are still fresh in our minds. From the beginning of prohibition there has been a sharp controversy as to what should constitute the maximum alcoholic content of a beverage before it could be regarded as intoxicating.

Following the adoption of the Eighteenth Amendment, the Volstead Act (41 U. S. Stat. at Large, 305)* was passed, which fixed the maximum alcoholic content of non-intoxicating beverages at not more than one-half of one per cent. Thereafter, beer made with a content of one-half of one per cent or less, generally known as " near beer," was sold as a soft drink. The consumption of " near beer " had no tendency to bring back the saloon or foster intemperance.

In April, 1933, Congress changed the definition of non-intoxicating alcoholic liquors and declared the same to contain not more than a maximum of three and two-tenths per cent of alcohol. As a result of this enactment the liquor traffic again became a legitimate business. The Legislatures of various States, including New York,

---

*U. S. Code, tit. 27, §§ 1, 4.

passed laws designed to prevent the return of the old type of saloon and to prevent the evils of the liquor traffic as it existed prior to the World War. To that end, the Legislature of this State enacted a law whereby alcoholic beverages to be consumed on the premises were permitted to be sold only in hotels, restaurants, beer gardens, clubs, railroad cars and vessels. Restaurants and beer gardens were required to have suitable table accommodations for at least twenty guests and the proper kitchen equipment to serve them. The Legislature apparently concluded that an eating place where liquor is served does not create as many evils as the saloon devoted primarily to the dispensing of liquor. As the result of the change in the maximum alcoholic content of liquor declared to be non-intoxicating and the enactment of the Alcoholic Beverage Control Law, restaurants, coffee shops, cafeterias and tap rooms had sprung up as if by magic all over the country, and the reports of the public revenues collected from licenses issued under the control law are eloquent witnesses of the extent of the traffic in alcoholic beverages under the recent act of Congress. Such is the background of the present statute of this State designed to control the liquor traffic.

The general power of the State to control or regulate the business of dealing in intoxicating liquors within its borders may not be seriously questioned. (*Delamater* v. *South Dakota*, 205 U. S. 93; *Foster* v. *Kansas*, 112 id. 201; *License Cases*, 5 How. [U. S.] 504; *Beer Co.* v. *Massachusetts*, 97 U. S. 25.)

The State may at any time prohibit the liquor traffic. There is no vested right to carry on such traffic and it may be prohibited regardless of the length of time it has been carried on or regardless of the sums of money which have been invested therein. (*Matter of Hering*, 133 App. Div. 293; *Bartemeyer* v. *Iowa*, 18 Wall. 129.)

In the exercise of the power to regulate and prohibit the manufacture and sale of intoxicating liquors, the Legislature may in connection therewith prohibit the sale of malt liquor, whether intoxicating or not. Such regulation may be reasonable and necessary so that opportunities for invasions of the traffic in intoxicating liquors may not be left open. (*Feibelman* v. *Alabama*, 130 Ala. 122; 30 So. 384.)

The Alcoholic Beverage Control Law, by subdivision 12 of section 2, defines a restaurant in this language:

" (12) ' Restaurant ' shall mean only a room regularly and in a *bona fide* manner used and kept open for the serving of meals to guests for compensation, which has suitable table accommodations for at least twenty guests therein at one and the same time, and a kitchen connected therewith containing conveniences for cooking sufficient to provide meals in a *bona fide* manner for twenty guests

at one and the same time. Table accommodations, for the purposes of this subdivision, shall not include seats or chairs arranged at a counter, bar, or similar contrivance. The term 'guest' within the meaning of this subdivision as to required accommodations is a person who, during the hours when meals are regularly served therein, goes to a restaurant for the purpose of obtaining, and actually orders and obtains at such time, in good faith, a meal therein."

It then provides, by subdivision 3 of section 76, that license for the sale of beer at retail to be consumed on the premises may be granted only to a *bona fide* hotel, restaurant, beer garden, club, railroad car or vessel.

The petitioners here claim that such classification is arbitrary and discriminatory. They urge that there can be no reasonable distinction between an eating place with accommodations for nineteen guests, or thirteen guests, and one for twenty guests, and that by such classification and definition they are deprived of equal protection of the law.

As a legal proposition equal protection of the law is not violated by classification, provided equal protection is afforded the members of each class, and provided further that such classification has some reasonable relation to the object sought to be accomplished by the statute. It would seem that experience has demonstrated that the dispensing of drinks in an eating place is not attended with the same evils formerly incidental to the saloon. The restaurant feature does away, to a considerable extent at least, with the gambling, the card playing and the loitering so often found in the old type of barroom. Such things would not be long tolerated in a *bona fide* restaurant because of the annoyance to guests. In the circumstances the court cannot say that the classification adopted by the Legislature bears no reasonable relation to the object sought to be accomplished by the Alcoholic Beverage Control Law.

It is essential that there be a standard whereby a restaurant within the meaning of the statute may be defined. Requiring suitable table accommodations for at least one hundred guests might well be unreasonable. The Legislature adopted a requirement that there be table accommodations for at least twenty guests. This would appear to be a reasonable requirement.

Courts will not interfere with a classification of this character unless the distinctions made are clearly arbitrary and without any relation to the purpose of the law, and this even though such classification appear to be unwise or unjust to some. (*Clark* v. *Kansas City*, 176 U. S. 114.) Furthermore, where size is an index it may be the basis of a classification. (*Engel* v. *O'Malley*, 219

U. S. 128.) Merchants have been classified according to the amount of their sales (*Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S. 283); coal mines upon the basis of the number of men employed in their operation (*McLean* v. *Arkansas*, 211 U. S. 539), and in the regulation of private bankers it has been held that there may be an exemption of those in whose business the average amount of each sum received is not less than $500 (*Engel* v. *O'Malley*, *supra*). These cases illustrate classifications held lawful for the reason that they had some relation to the matter sought to be regulated.

As heretofore stated, the declared policy of the statute is to safeguard temperance, promote obedience to law, and to prevent unlawful manufacture and sale of beverages prohibited by law. It cannot be said that the legislative plan limiting licenses to sell beer to be consumed on the premises to restaurants and other places where meals are served to guests violates constitutional requirements.

The respondents in the return submitted declare that the petitioners' application for a license was denied for two reasons, *first*, that said petitioners do not operate a restaurant within the meaning of the statute; and *second*, because the State Board has a discretion in limiting the number of licenses.

It will be noted that section 70 provides that the State Board is given the discretion to determine the number of licenses, the location and to whom the same shall be issued, subject to judicial review. It would seem that the Legislature has set no standard as a guide to the control board in determining the number and location of licenses. A serious question is thus presented whether the Legislature has attempted to delegate to this control board its legislative function, although it may be that a wider discretion may be delegated in connection with a traffic that the Legislature may absolutely prohibit.

In the exercise of the police power the Legislature may create ministerial boards with the power to prescribe rules for the purpose of carrying out the purposes of the statute. The State Control Board is given power by section 17 of the act to adopt rules and regulations for the supervision and regulation of the manufacture and sale of beer. While the Legislature may delegate administrative functions, the statute must prescribe some standard by which the action of the board is to be governed; otherwise, the plenary power of the Legislature would be intrusted to a board whose action might be arbitrary and discriminatory. In other words, there is no unlawful delegation of legislative authority if the Legislature fixes the standard by which the board is to be governed. That

standard may be in its nature a general one if it be capable of reasonable application under the circumstances. (*Village of Saratoga Spgs.* v. *Saratoga G., etc., Co.*, 191 N. Y. 123; *Insurance Co. of No. America* v. *Welch*, 49 Okla. 620; 154 Pac 48; *Interstate Commerce Commission* v. *Goodrich Transit Co.*, 224 U. S. 194; *People* v. *Klinck Packing Co.*, 214 N. Y. 121; *People* v. *Beakes Dairy Co.*, 222 id. 416; *Wichita R. R.* v. *Public Utilities Commission*, 260 U. S. 48.)

Since the State Control Board has determined that the petitioners are not conducting a *bona fide* restaurant and the statute in this respect is valid, it is not necessary to a decision here to pass upon the denial of the Board to issue a license in the exercise of a discretion in limiting the number of licenses. Where a constitutional question is raised, if the record presents some other clear ground upon which the court may rest its judgment, thereby rendering the constitutional question immaterial to the case, the question of constitutional power will be postponed for consideration in a case where a decision is unavoidable. (*Frees* v. *Ford*, 6 N. Y. 176; *Siler* v. *Louisville, etc., R. Co.*, 213 U. S. 175.)

The application for an order of mandamus is denied, with twenty-five dollars costs.